## LOCKRIDGE *v.* STATE

No. 43345          February 22, 1965          172 So. 2d 192

*Roy O. Parker,* Tupelo, for appellant.

*G. Garland Lyell, Jr.,* Asst. Atty. Gen., Jackson, for appellee.

JONES, J.

The appellant was convicted of murder and sentenced to life imprisonment by the Circuit Court of Lee County, Mississippi, from which judgment he appeals. We affirm the decision of the lower court.

The errors assigned are:

(1) That the evidence was insufficient to sustain the verdict and that the court overruled the motion for a directed verdict of not guilty by the appellant.

(2) That the court erred in not declaring a mistrial when one of the officers referred to the knife with which deceased was stabbed as "the murder weapon."

(3) The court erred in refusing defendant's instruction number 2 as follows: "The court instructs the jury for the defendant that intent is a necessary element of the crime charged in the indictment, and unless you believe from the evidence that the State has proved beyond every reasonable doubt that the defendant intended and did take the life of Ozell Hall with malice aforethought, then it is your sworn duty to find the defendant not guilty."

(4) That the evidence was not sufficient to sustain a verdict of murder and that at most the jury could only find the defendant guilty of manslaughter.

The facts as shown by the evidence and found by the jury were: The defendant had the idea for some reason that the deceased, Ozell Hall, had been to appellant's

home with appellant's wife. The killing occurred on Saturday night, May 16, 1964. Early that morning about three o'clock Hall and his wife were awakened by someone at the door. According to the dead man's wife, appellant had a piece of iron in his hand and threatened Hall and was fussing at him about visiting appellant's wife. There was a scuffle and as a result thereof Hall pushed the appellant off the front porch, knocking off the banister. As the appellant was departing, he said "I'll get you, Mann — I'll get you if you get out on Saturday." Hall stated, "I'll get out on Saturday," to which appellant replied, "Well, I will, I'll get you."

That night about eight o'clock Hall and his four year old daughter left home for the purpose of carrying a fish to Willie Booker. The fish had been left with Hall for Booker by their boss.

There were several people at the home of Sallie Mae Dickerson and Rosie Lee Dickerson, which was the house to which Hall and his daughter went to carry the fish for Willie Booker. The fish was carried into the kitchen and various ones were in and out of the kitchen looking at the fish. The fight resulting in the death of Hall occurred in the kitchen. At the time there was no one present except the appellant, Hall, and Hall's four year old daughter. The daughter, of course, did not testify. Sallie Mae Dickerson ran to the kitchen when someone said they were fighting, but when she reached there, the wounds had been inflicted. She asked appellant, "Ernest Lee, did you down that boy from the back?" And the appellant replied, "You know how a fellow feels when he comes into your house like I done and found him in there with my wife." She then ordered him out of the house; he threw the knife across the table and left. The knife was a butcher knife. No one saw the man Hall at any time with any weapon of any sort. Hall was taken to a hospital and examined by Dr. Love. He expired while x-rays were being taken.

Dr. Love gave as the cause of death the internal hemorrhaging caused by two knife wounds, one in front in the V formed by the ribs, and the other in the back. The investigating officers finally arrested appellant. On the way to the police station the officer testified that the appellant freely and voluntarily and without any promises of reward and without any duress, replied when the officer asked him why he cut Hall, that he wanted to hurt him, and the officer answered that he had done a good job; then the appellant stated, ''I did not want to kill him; I just wanted to hurt him real bad.'' The doctor who examined Hall at the hospital, testified that in his opinion the wounds were separate and constituted two different stabbings.

Appellant was the only eye witness to the killing. He swore that on Friday night before the killing he came home about nine or ten o'clock and saw the deceased get off the bed and start going to the door. The defendant said, ''I run around to the back door and he run out.'' He said he went after him, but couldn't catch him. Appellant returned to his house and his wife was gone. She had left the baby there and appellant carried it to his mother's house. Then he says he went to Hall's house, knocked on the door, and told him, ''Ozell, I want to speak to you,'' and Hall said, ''O.K.,'' and the appellant said, ''I went in and I told him 'I don't think anything of a man that makes like he is your friend here, and then when you are off working, goes up to your house and stays with your wife.' '' Ozell answered that he didn't go up there with his wife and appellant then said Ozell pushed him off the porch. He testified there was a fuss in progress in the house and he, appellant, said, ''You'd better not let me catch you over at my house anymore with my wife.'' He then went home and to bed, got up next morning and went to work. Appellant further stated that when he first saw Hall at his, appellant's, home, he, Hall, was getting out of bed and

putting on his clothes, and said his, appellant's wife, was in bed with him. He denied saying that he was going to kill him.

He swore that on Saturday night he was looking for Willie Booker and Willie was not at his home, so he guessed he was over at his girl's home. His girl was Honey Dickerson. About the time he got there Hall was there. He says they all went in. Appellant went on through the house to the kitchen and testified as follows, "that Hall told me 'I want to speak to you a minute.' I said, 'Yea.' And then he says to me, 'What in the - - - do you mean by letting my wife in on what I did? You had no business mentioning it to her or anything about that around my wife.' And I said, 'Well, you hadn't got no business messing around with my wife, either.' And then Hall cursed my wife, and I said 'No use talking like that to me. You just stay away from my wife because I don't like you being around her and you better not come back over there.' And then he says, 'Well, now if you want to fight, come on outside.' And with that he comes out with a knife and he hits me on the hand, and then he went to scuffling and I got aholt of him and he broke loose and went out the door.'' Appellant then stated that he stabbed Hall only once and that Hall then broke and ran, and appellant threw the knife down and went home. He bases his plea on self defense. He claims Hall was trying to kill him, and he was trying to keep from being killed.

On cross-examination he swore he and Hall were just talking. That he, Hall, was mad and he, appellant, was too. He denied any insinuation that he was looking for Hall on Saturday night, but says he was looking for Booker. Hall had his four year old daughter with him, and appellant says he doesn't mean to tell the jury that Hall was looking for him, appellant, at that time. He denied telling the officers that he wanted to hurt Hall. He testified that he and Hall began scrambling after

Hall cut him on the hand, and we quote a portion of his cross-examination.

"Q. You had both of his arms and holding them with your hands, is that right?

"A. Yes, sir.

"Q. All right now, that is the way you had him, and he had a knife in his hand.

"A. Yes, sir.

"Q. Now, how did you expect to get the knife away from him?

"A. Well, we scuffled around and I finally got aholt on his arm and grabbed it and held them and we scuffled around and I finally got loose from him.

"Q. And then after you got loose from him did you, had you got the knife from him or did you get a knife somewhere else?

"A. No, sir, I got it away from him.

"Q. Then he was completely defenseless at that time, was he not?

"A. Well, no, sir, I wouldn't say he was.

"Q. Well, you got the knife, didn't you?

"A. Yes, sir.

"Q. Now you say that you didn't stab him in the back?

"A. No, sir, I didn't stab him in the back.

"Q. Where did you stab him.

"A. I just jugged him with the knife that way, I just jugged him.

"Q. He was completely defenseless then?

"A. No, sir, he jerked loose and run.

"Q. He was trying to run from you, wasn't he?

"A. No, sir he run when I just turned him loose.

"Q. Well, he didn't have any weapon in his hand of any kind, did he?

"A. No, sir, not then, I don't guess he did."

As to assignment number 1, appellant relies upon the rule announced in *Weathersby v. State,* 165 Miss. 207,

147 So. 481 (1933) and other cases such as *Gray v. State,* 158 Miss. 266, 130 So. 150 (1930); *Patty v. State,* 126 Miss. 94, 88 So. 498 (1921); *Houston v. State,* 117 Miss. 311, 78 So. 182 (1918). The rule announced by the *Weathersby* case is: "It has been for some time the established rule in this state that where the defendant or the defendant's witnesses are the only eye witnesses to the homicide, their version, if reasonable, must be accepted as true, unless substantially contradicted in material particulars by a credible witness or witnesses for the State or by the physical facts or by the facts of common knowledge."

██ █ A reading of the facts hereinbefore stated is sufficient to show contradictions between the defendant's version and physical facts, as well as between statements by him to others and his statement on the witness stand. He claimed he stabbed the deceased only once; the doctor says there were two stab wounds on him. The officers said he told them he wanted to hurt him. He denied this. He had visited Hall's home and according to Hall's wife had threatened Hall the night before. According to his own testimony, he had taken the knife, which he said Hall had, away from Hall, so that Hall had no weapon. We think clearly the rule announced in the *Weathersby* and similar cases is not applicable here ██ █ and that the testimony was sufficient to sustain the verdict.

The second assignment is based upon the following which occurred during the testimony of Mr. Felix R. McClellan, a policeman of the city of Tupelo, who investigated and with one of his co-workers, arrested the appellant. While the witness McClellan was testifying, the following occurred: ". . . we went in and we got the murder weapon, then later found out he was at his father's house.

"Q. Who was at whose house?

"A. Lockridge.

"BY MR. PARKER:

"We object, if the court please, to the witness saying "murder weapon," I think that is highly prejudicial and I move the court for a mis-trial on that grounds.

"THE COURT:

"The objection is sustained to the use of the words "murder weapon" and the jury is instructed to disregard that, but the motion for a mis-trial will be overruled.

"Gentlemen, you will disregard that reference to the weapon as being the murder weapon.

"BY MR. DOTY:

"If it please the court, May I ask an explanation of the courts reason for its ruling?

"THE COURT:

"Yes, sir. We have a trial here that we are having to determine whether there was a murder or not, it has not been an established fact that there was a murder."

■■ The statement by the witness was spontaneously and thoughtlessly made by him and not at the suggestion of the district attorney. After it had been made, the circuit judge and the district attorney were very careful to see that the jury was not misled. There was no reversible error under this item number 2.

■ ■ The instruction cited in assignment number 3 was properly refused. Murder had been defined in other instructions given by the court to the jury, and many instructions were given showing the burden that the State had to carry. The instruction also conflicted with the one given authorizing a verdict of manslaughter.

As to assignment number 4, as heretofore stated, we think the evidence was amply sufficient to support the verdict of murder and that the fourth assignment of error is not well taken.

The case is therefore affirmed.

Affirmed.

*Lee, C. J., and Ethridge, Rodgers and Patterson, JJ.,* concur.