KOEHRING COMPANY, a Wisconsin corporation, Plaintiff,

v.

AMERICAN MUTUAL LIABILITY IN-SURANCE COMPANY, a foreign mutual insurance company, Defendant.

Civ. A. No. 78–C–737.

United States District Court, E.D. Wisconsin.

May 23, 1983.

Andrew O. Riteris and Paul S. Medved, Michael, Best & Friedrich, Milwaukee, Wis., for plaintiff.

Robert D. Scott, Dennis Grzezinski and Michael Lund, Frisch, Dudek & Slattery, Ltd., Milwaukee, Wis., for defendant.

## DECISION and ORDER

TERENCE T. EVANS, District Judge.

Five lawyers, two for the plaintiff, Koehring Company, and three for the defendant, American Mutual Liability Insurance Company, have participated in the preparation of the briefs filed with the court on Koehring's pending motion for summary judgment. When the underlying disputes in this case began, way back in 1959, none of the five were lawyers. The gray beard of the bunch, Andrew O. Riteris was a 24-year-old first year law student at Marquette University. Robert D. Scott (who was, ironically, born in Oklahoma

where this mess all started) was a mere lad of 19, 6 years away from the day when he would receive his law degree from Georgetown. The other three, Dennis M. Grzezinski, Michael J. Lund and Paul S. Medved, were still of the pre-Clearasil set, being only 9, 5 and 3 years of age respectively when it all started. Somewhere, there must be a couple of third-graders playing kickball who will, when they mature, become lawyers and join in this quixotic legal odyssey.

To understand the present controversy, I will return to the era before the Beatles were formed, a time when Dwight D. Eisenhower was the President of the United States. The return is not an unpleasant one. 1959 was a great year for me, a 19-year-old college sophomore.

In 1959, the Hyde Construction Company of Mississippi was awarded a contract by the United States to construct a spillway for the Keystone Dam on the Arkansas River, in the State of Oklahoma[1]. The performance of the contract required the acquisition and installation of a large concrete mixing and cooling plant. Hyde contracted to purchase from Koehring the concrete plant which Koehring proceeded to erect at the job site. Hyde became dissatis-fied with the operation and capacity of the installed plant, and employed Vardaman S. Dunn, a Mississippi lawyer, to bring an action against Koehring for breach of warranty. Suit was filed against Koehring on August 30, 1961, in the United States District Court for the Southern District of Mississippi, at Jackson, seeking damages for breach of warranty, an attachment against Koehring's resident debtors, and other relief. Koehring challenged the jurisdiction of the Mississippi federal court, claiming that Koehring was not subject to suit in Mississippi; in the alternative, Koehring moved for transfer of venue under 28 U.S.C. § 1404(a) to the federal District Court for the Northern District of Oklahoma.

Six days after the filing of this motion, Hyde, on September 27, 1961, sued Koehring in the Chancery Court of Hinds County, Mississippi, at Jackson, on the same breach of contract action and obtained jurisdiction under a state statute providing for chancery attachment, which was executed upon equipment dealers in Mississippi indebted to Koehring. Hyde apparently filed the state action as a protective measure to be assured of a Mississippi forum in the event the

---

1. The background facts come primarily from two decisions, *Hyde Construction Co., Inc. v. Koehring Company*, 387 F.Supp. 702 (S.D.Miss. 1974) and *Dunn v. Koehring Co.*, 546 F.2d 1193 (5th Cir.1977). Other courts blessed with various aspects of this case include those wherein the following decisions were rendered: *Koehring Company v. Hyde Construction Co., Inc.*, 324 F.2d 295 (5th Cir.1963); *E.E. Morgan and R.W. Hyde, Jr. v. Jackson Ready-Mix Concrete*, 247 Miss. 863, 157 So.2d 772 (Miss.1963); *Dunn v. Stewart*, 235 F.Supp. 955 (D.C.Miss.1964); *Koehring Company v. Hyde Construction Co., Inc.*, 253 Miss. 675, 172 So.2d 192 (Miss.1965); *Hyde v. Koehring Company; Vardaman Dunn v. Koehring Company*, 348 F.2d 643 (10th Cir. 1965); *Koehring Company v. Hyde Construction Co., Inc.*, 254 Miss. 214, 178 So.2d 838 (Miss.1965); *Koehring Company v. Hyde Construction Co., Inc.*, 253 Miss. 675, 178 So.2d 857 (Miss.1965); *Koehring Company v. Hyde Construction Co., Inc.*, 382 U.S. 362, 86 S.Ct. 522, 15 L.Ed.2d 416 (1965); *Koehring Company v. Hyde Construction Co., Inc.*, 254 Miss. 514, 182 So.2d 580 (Miss.1966); *Koehring Company v. Hyde Construction Co., Inc.*, 383 U.S. 939, 86 S.Ct. 1062, 15 L.Ed.2d 857 (1966); *Koehring Company v. Hyde Construction Co., Inc.*, 254 Miss. 214, 184 So.2d 415 (Miss.1966); *Jack T. Stuart v. Vardaman S. Dunn*, 363 F.2d 591 (5th Cir.1966); *E.E. Morgan v. USF & G*, 191 So.2d 851 (Miss.1966); *E.E. Morgan v. USF & G*, 191 So.2d 917 (Miss.1966); *Koehring Company v. Hyde Construction Co., Inc.*, 385 U.S. 949, 87 S.Ct. 323, 17 L.Ed.2d 227 (1966); *Hyde Construction Co. v. Koehring Company*, 388 F.2d 501 (10th Cir.1968); *Vardaman S. Dunn v. USA*, 388 F.2d 511 (10th Cir.1968); *Koehring Company v. Hyde Construction Co., Inc.*, 391 U.S. 905, 88 S.Ct. 1654, 20 L.Ed.2d 419 (1968); *Morgan v. USF & G*, 222 So.2d 820 (Miss.1969); *Koehring Company v. Hyde Construction Company*, 297 F.Supp. 731 (E.D.Wis.1969); *Hyde Construction Co. v. Koehring Company; Vardaman S. Dunn v. Koehring Company*, 321 F.Supp. 1193 (S.D.Miss.1969); *Koehring Company v. Hyde Construction Co., et al.*, 236 So.2d 377 (Miss.1970); *Morgan v. Thomas*, 321 F.Supp. 565 (S.D.Miss.1970); *Morgan v. USF & G*, 245 So.2d 587 (Miss.1971); *Koehring Company v. Hyde Construction Co., Inc.*, 424 F.2d 1200 (7th Cir.1970); *Morgan v. Thomas*, 448 F.2d 1356 (5th Cir.1971); *Hyde v. Koehring; Dunn v. Koehring*, 455 F.2d 337 (5th Cir.1972).

Mississippi federal court failed to maintain jurisdiction. Koehring considered but did not seek removal[2]. Hyde did not immediately seek prosecution of the state action, allowing it to remain dormant pending disposition of Koehring's contentions before the federal court in Mississippi. After a hearing, United States District Judge Sidney Mize concluded that the federal court possessed in personam jurisdiction over Koehring, overruled Koehring's motion for dismissal or transfer of venue, but on June 15, 1962, certified his rulings for an interlocutory appeal to the United States Fifth Circuit Court of Appeals.

On September 19, 1963, the Fifth Circuit, without reaching the jurisdictional question, reversed Judge Mize on the venue issue and remanded the case to the district court for transfer to the Oklahoma court. Ultimately, the mandate of the Fifth Circuit was carried out, and the federal suit was transferred to Oklahoma, effective March 10, 1964.

Meanwhile, Koehring had answered on the merits in the state court action, thus subjecting itself to the in personam jurisdiction of the Mississippi Chancery Court. Miss.Code Ann. § 2729 (1942). The Chancery Court trial was set to begin at 2 p.m. on March 11, 1964, after Chancellor Stennett, judge of the Mississippi Chancery Court, had considered and overruled a series of motions by Koehring to stay or continue the trial. So the stage was set; Hyde wanted to litigate in Mississippi and Koehring in Oklahoma. The bad dream was about to get worse.

During the morning of March 11, Koehring applied to Judge Allen E. Barrow, United States District Judge of the Northern District of Oklahoma, at Tulsa (the city where Attorney Scott was born just 24 years earlier), for a restraining order to halt the trial of the state court suit. At this hearing, Hyde challenged both the jurisdiction of the Oklahoma federal court and the power of the federal court, in view of the Anti-Injunction Act, 28 U.S.C. § 2283, to enjoin the state proceedings. Judge Barrow decided that, because of the nature of the case and the special circumstances incident to the transfer, § 2283 did not preclude the granting of a temporary restraining order to enjoin Hyde and its attorneys from prosecuting the Mississippi action, pending a determination of federal jurisdiction. Thus, at or about the same hour of the day when the trial on the merits was to begin in state court, a temporary restraining order was granted by Judge Barrow, who also requested briefs on the issues and set the cause for hearing on Koehring's motion for preliminary injunction the following Monday, March 16. Hyde's attorneys received immediate notice of the order. Judge Stennett was also notified, by telegram, of Judge Barrow's order.

Although Chancellor Stennett at first offered to recess the case to March 23, Dunn, without consulting Hyde's corporate officers, insisted that his client wished the trial to proceed despite the restraining order. The Chancellor, on March 12, ordered that the trial proceed. It did. That same day, Koehring filed in the Oklahoma federal court a petition charging Hyde and Dunn with willful disobedience of the restraining order, and obtained from Judge Barrow an order directing Hyde and Dunn to appear on March 14 at Tulsa to show cause why they should not be held in contempt of court.

The show-cause order was served upon Dunn on March 13 at Jackson, Mississippi, but no service was obtained upon Hyde or its corporate officers. Dunn failed to appear at the March 14 hearing, and Hyde was represented only briefly by counsel, who did not remain throughout the proceedings. Judge Barrow received evidence that Hyde and Dunn had violated his restraining order by proceeding with trial after notice of the restraint. The court found Hyde and Dunn in civil contempt. After announcing from the bench that criminal contempt proceedings were also involved, the court directed the United States Attorney to pre-

---

**2.** In retrospect, Koehring's failure to seek removal appears to have been the cause of most of the troubles that were to be encountered in the future.

pare an order for Dunn's arrest and appearance at Tulsa. An arrest order issued forthwith, and on March 16 it was served on Dunn at Jackson. Dunn immediately sought habeas corpus relief from Judge Mize, who released him on bail and later ruled that the arrest order was void.[3]

Dunn was thus able to resume the prosecution of the Chancery trial until the case concluded on March 25. On April 8, 1964, Chancellor Stennett rendered an in personam decree for $464,450.08 in favor of Hyde against Koehring. Koehring appealed to the Mississippi Supreme Court from Chancellor Stennett's decision on the merits. On October 4, 1965, the state Supreme Court upheld the jurisdiction of the Chancery Court to hear the case, notwithstanding the pendency of the federal action, and affirmed the decree in favor of Hyde with a reduction of about $50,000 in damages.[4] Koehring considered but decided against petitioning the United States Supreme Court for review. Thus, the judgment obtained by Hyde became final.

During the time period when the Mississippi case was going forward, civil contempt proceedings by Koehring against Dunn and Hyde were proceeding in the Oklahoma federal court. On June 18, 1964, Judge Barrow conducted a hearing on Koehring's petition for contempt sanctions against Hyde and Dunn. On September 1, 1964, the District Judge enjoined Hyde from collecting the judgment rendered against Koehring, directed that the case be retried in Tulsa, entered a civil contempt judgment in favor of Koehring against Hyde and Dunn for $9,009.80 to defray litigation expenses, but nevertheless allowed Hyde to participate in the appeal then pending in the Mississippi Supreme Court.

In a subsequent appeal, the United States Supreme Court determined, on January 17, 1966, that the transfer order of the Fifth Circuit vested jurisdiction in the Oklahoma District Court.

On March 21, 1966, Hyde filed a motion in the Oklahoma federal court to dissolve the September 1, 1964, injunction against collecting on the Mississippi judgment, to vacate the civil contempt orders, and to dismiss the action. Hyde claimed that the Mississippi judgment was *res judicata* as to any further proceedings. When these motions were overruled April 18, 1966, Hyde took an appeal to the United States Court of Appeals for the Tenth Circuit, which granted a stay of further proceedings in the District Court pending appeal.

Meanwhile, on June 28, 1966, the Court of Appeals for the Fifth Circuit reversed and vacated Judge Mize's habeas corpus order which had discharged Dunn from custody.[5] Dunn then advised Judge Barrow that he would appear at Tulsa, upon request, to answer contempt charges, without necessity of the issuance of further process.

On July 22, 1966, the United States Attorney at Tulsa instituted formal criminal contempt charges against Dunn who was arraigned and pled not guilty. Dunn also moved for change of venue to Mississippi and for a jury trial. Both motions were denied. After a hearing before the court on August 23, Dunn was adjudged guilty of

3. *Dunn v. Stewart*, 235 F.Supp. 955 (D.C.Miss. 1964). It was Judge Mize's view that the underlying restraining order was invalid because of the federal anti-injunction statute and also because the arrest order was one for civil contempt, controlled by the territorial limits of effective service, Rule 4(f), F.R.C.P., and not effective to subject Dunn, who was served outside the state of Oklahoma and more than 100 miles from Tulsa, to lawful arrest.

4. *Koehring Co. v. Hyde Constr. Co.*, 254 Miss. 214, 178 So.2d 838 (1965); 253 Miss. 675, 178 So.2d 857 (1965).

5. *Stewart v. Dunn*, 363 F.2d 591 (5 Cir.1966). The Fifth Circuit held that since the Oklahoma federal court had jurisdiction when it issued the restraining order, the validity of the order vis-a-vis 28 U.S.C. § 2283 could be challenged only on appeal, and not in a habeas corpus proceeding. Hence, it was a lawful order. The court was also of the view that the proceedings at Tulsa, consisting of the petition to cite for contempt, affidavit, and show-cause order, which were served upon Dunn one day before the hearing, were adequate to meet the procedural requirements of Rule 42, F.R.Crim.P., for the court to entertain criminal contempt proceedings and issue the order for Dunn's arrest.

criminal contempt and sentenced to three months in jail. He was immediately released on bond pending appeal.

On January 24, 1968, the Court of Appeals for the Tenth Circuit decided that Judge Barrow's March 11, 1964, temporary restraining order against the prosecution of the state action was invalid because of the prohibition in § 2283. The court vacated the District Court's order that had enjoined Hyde's collection of its judgment and the order that awarded Koehring damages in civil contempt.[6] Koehring petitioned the Supreme Court for *certiorari,* which was denied May 6, 1968. This nullified all civil orders entered against Hyde and Dunn by the Oklahoma federal court. In a separate opinion, the Court of Appeals for the Tenth Circuit also reversed Dunn's conviction of criminal contempt and remanded the case to the District Court for further proceedings. The Court of Appeals declared that the invalidity of the temporary restraining order did not destroy the criminal contempt conviction since the District Court had requisite jurisdiction. Reversal was ordered, nevertheless, because the conviction was based upon an assumption that the restraining order was valid, and the appellate court decided that the District Court should have an opportunity to determine whether Dunn should be subjected to punishment for disobedience of an invalid order. Subsequently, on August 27, 1968, Judge Barrow dismissed the criminal charge against Dunn.

A charge of criminal contempt had also been instituted against Hyde on a show-cause order issued by Judge Barrow on April 7, 1966. This proceeding was initiated pursuant to an affidavit filed by Koehring. Hyde entered a plea of not guilty to this charge. The criminal proceeding remained in abeyance until the reversal of the District Court's orders of injunction and civil contempt. On May 17, 1968, Koehring filed a petition in the criminal contempt action, alleging that Hyde was without assets other than the unpaid judgment against Koehr-

ing, and paid into court the full amount of the Mississippi judgment, with accrued interest, to insure the availability of funds to pay any fine that the court might impose, in the event of Hyde's conviction of criminal contempt. On that same day, Koehring obtained an order restraining Hyde from attempting to collect its judgment pending disposition of the Hyde criminal contempt charge. In hearings before Judge Barrow on May 21, Koehring contended that Hyde might be fined for criminal contempt in an amount equal to the Mississippi judgment, in which event all or a portion of such fine could be paid to Koehring to diminish its obligation under that judgment. The United States Attorney questioned the standing of Koehring and the propriety of awarding Koehring any portion of a fine for criminal contempt, should one be levied against Hyde. The court declined to issue the requested injunction, directed that the money paid into court be returned to Koehring, and dismissed Koehring's petition. Although the criminal contempt charge against Hyde remained pending on the docket, it never came to trial. It was finally dismissed on March 4, 1969.

When Hyde proceeded to issue execution in Mississippi on the judgment, Koehring, on May 27, 1968, filed in this court a petition in the nature of an interpleader, asserting that it was confronted with conflicting claims as judgment debtor to Hyde. Koehring then paid into this court the amount of the Mississippi judgment plus accrued interest, and obtained an *ex parte* order enjoining Hyde from attempting to collect its judgment. In this action, which stayed execution and garnishment proceedings in Mississippi, Koehring asserted, as a possible offset, its own potential claim to the interpleaded funds, by referring to an alleged allocation of a fine upon conviction of Hyde, should that occur in the still pending Oklahoma criminal contempt proceeding. Hyde moved to dismiss the interpleader action, or, alternatively, to transfer it to the Mississippi federal court. On January

---

**6.** *Hyde v. Koehring,* 388 F.2d 501 (10 Cir.1968), cert. denied 391 U.S. 905, 88 S.Ct. 1654, 20 L.Ed.2d 419 (1968).

20, 1969, Judge (now Chief Judge) John W. Reynolds of this court dismissed the interpleader action [7]. Koehring appealed to the United States Court of Appeals for the Seventh Circuit and obtained an order reinstating the injunction against enforcement of the Mississippi judgment pending appeal.

During the pendency of the Wisconsin interpleader action, Hyde, alleging insolvency, applied to the Mississippi Chancery Court for a voluntary receivership to take charge of its assets, principally the judgment obtained from Koehring, and to determine the priority of its creditors. These proceedings were allowed by the Seventh Circuit in an interim order. Koehring attempted to vacate the Mississippi receivership on the ground that it was established without notice to all interested parties. On June 6, 1969, the Chancery Court denied Koehring's petition to set aside the receivership, and later entered a decree adjudicating priority of claims as between various creditors to the proceeds expected to be recovered by Hyde from Koehring. Koehring appealed to the Supreme Court of Mississippi from these orders. On March 17, 1970, the Court of Appeals for the Seventh Circuit affirmed the dismissal of the Wisconsin interpleader action and vacated the last injunction secured by Koehring [8]. After the court dismissed the Wisconsin interpleader action and vacated the federal injunction, Koehring dismissed its appeals in the state Supreme Court, and at long last paid the judgment to the Chancery Receiver.

While all this was going on, other battles were being fought.

In May of 1969, Hyde sued Koehring in the Circuit Court for Hinds County, Mississippi, for malicious prosecution and abuse of process alleging, in substance, that almost every tactic employed by Koehring in the *Hyde v. Koehring* litigation had been malicious, oppressive and wrongful. The suit claimed that " . . . as a direct result of the malicious, oppressive and wrongful misuse and abuse of process . . . " Hyde had been damaged. Hyde sought $5,000,000 in actual and punitive damages.

On August 21, 1969, Dunn filed a complaint in the same Mississippi State Court against Koehring, making almost the identical allegations as Hyde had made earlier. Dunn sought $500,000 in actual and punitive damages.

The cases were eventually removed to the United States District Court for the Southern District of Mississippi and consolidated for trial.

Now we must back step for a moment. On November 30, 1963, American Mutual Liability Company, the defendant in this present action, issued a policy of comprehensive general liability to Koehring. The policy contained a "Personal Injury Liability Coverage Endorsement," obligating American Mutual to pay:

> All sums which the insured shall become legally obligated to pay as damages because of injuries sustained by any person . . . and arising under the following hazards . . .
> HAZARD A. False arrest, detention or imprisonment, or malicious prosecution.

After the Hyde malicious prosecution suit was filed in May of 1969 but before the Dunn case went to suit, Koehring referred the matter to American, asserting that the claim was covered under the 1963 insurance policy.

In a letter dated August 15, 1969, American's trial counsel, Dan H. Shell, notified Koehring that American would defend the Hyde suit under a reservation of rights, i.e., upon

> "the stipulation and express understanding that its so doing will be without prejudice to its rights at any time hereafter to deny and dispute its coverage or obligation under the insurance policy or policies . . . "

After the Dunn suit was filed, American changed its mind. In a letter dated November 3, 1969, American advised Koehring

---

7. 297 F.Supp. 731 (E.D.Wis., 1969).

8. *Koehring Co. v. Hyde Constr. Co.*, 424 F.2d 1200 (7 Cir.1970).

that it had decided to afford coverage and to withdraw its earlier notice of reservation of rights. American stated that:

"Since it has been decided by the American Mutual to afford coverage in protection of the Hyde litigation, we hereby withdraw or Notice of Reservation of Rights furnished your company by letter dated August 15, 1969 . . ."

American's decision to afford coverage appears to have been a deliberate and well considered one. Mr. Shell, the author of the August 15th Reservation of Rights letter, had, as early as July 24, 1969, advised American that coverage should be afforded in the Hyde and Dunn cases. See Shell's July 24, 1969, letter to Mr. O.M. Burns, American's New Orleans District Claims Manager, affixed as an exhibit to Koehring's brief. Shell's letter to Burns stated in part:

" . . . I reached the conclusion that we do have coverage, and that we have no choice but to furnish full defense for the acceptance of the responsibilities specified in the policy and endorsement . . . [I]t is my opinion that we are in this matter and that coverage must be furnished . . ."

Others at American apparently agreed that coverage was proper. Mr. M.C. Ball, American's Division Claims Manager, in a memo dated August 28, 1969, informed Mr. J.H. Pollard, Assistant Vice-President of Claims in the Home Office, that he thought coverage was provided. Mr. Burns himself, as evidenced by memos in the file, also felt that American's policy covered the allegations in both the Hyde and Dunn cases.

In any event, the coverage issue was resolved by October 23, 1969, at which time Mr. R.D. MacLean, Vice President of Claims in American's Home Office, informed Mr. T.P. Gallagher, Vice President and General Manager of American's Western Division Operations, that the issue of coverage had been decided in Koehring's favor and that Koehring should be so advised immediately. MacLean's rationale for affording coverage was stated in an Octo-

ber 23, 1969 internal memorandum as follows:

" . . . The action is in Mississippi and will have to be defended there and our counsel has already indicated that in his opinion there is definitely coverage. We are all pretty much in agreement that a decision could go either way and also that any sizeable amount of damages seems very remote—also that we would have the defense of 'independent contractor' in that if our insured is held responsible, they have an action over against their attorneys who would be responsible. We assume this firm would have Malpractice coverage. Additionally there seems to be no malicious prosecution or abuse of process; hence if the insured is held responsible, in our joint opinion damages should not be great and if there are any, we should be able to recoup from the attorneys who represent Koehring. It was decided that in view of the doubt we would give the edge to our insured and grant coverage—we are presently defending the case under Reservation of Rights and this can be withdrawn. It should be explained to the insured, and I gather you will do that today, that we intend to exercise all of our rights of defense, including the right to sue their attorneys for Malpractice in the event that there be a judgment against Koehring . . ."

On November 3, 1969, American withdrew its Notice of Reservation of Rights and advised Koehring that it would afford coverage.

By letter of November 21, 1969, Koehring's house counsel, F. Kristen Koepcke, apparently concerned about possible excess exposure over the limits provided in the policy, asked American to be made an attorney of record in the Hyde and Dunn cases:

We do request, that the undersigned be made an attorney of record in this matter, if permitted by local court practice, to insure that we are kept thoroughly advised of all matters pertaining to the litigation.

American, in a letter written by Mr. Burns on December 1, 1969, declined, at least for the time being, Attorney Koepcke's request, stating:

We do not believe that it is necessary that you be made an Attorney of Record since our internal handling requires that we keep our Milwaukee office fully apprised of all pertinent developments surrounding these cases, that office will in turn keep your Company fully apprised. We will, however, discuss this desire with our Counsel at Jackson, Mississippi for their advice as concerns your request that you be made an Attorney of Record. We are also alerting our Jackson, Mississippi Counsel as to the contents of your November 21st letter.

After years of discovery and pretrial maneuverings, the cases were finally tried to the court without a jury in March of 1974. On December 31, 1974, the court rendered its decision finding Koehring liable to Hyde in the amount of $161,337.20 in actual damages, and $200,000 in punitive damages. No liability was found in the Dunn case. 387 F.Supp. 702 (S.D.Miss.1974).

After the December 31, 1974 judgment was entered, American's claims people had a conference, apparently for the purpose of determining whether American could avoid coverage for the punitive damage award. See the deposition testimony of Mr. Pollard, at pp. 13–18. The conclusion was that American would cover the actual but not the punitive damage award. This was made known to Koehring by Attorney Shell in a letter dated January 29, 1975, and sent to C.W. Walton, Koehring's General Counsel, and Maurice J. McSweeney, one of its attorneys at the Milwaukee law firm of Foley and Lardner. Shell's letter, which also advised that American had decided to appeal, stated:

The judgment in this cause included interest on the entire recovery of compensable damages of $161,337.20 and punitive damages of $200,000.00.... American Mutual Liability Insurance Company has taken a look at its position in this situation and it is the position of American

Mutual that its policy does not cover the finding for punitive damages if punitive damages are not permitted by law for recovery in an insurance contract in the state where the judgment is rendered. Since Mississippi has had no decisions in this field, you are notified that American Mutual, should its appeal be unsuccessful, will take the position that it has no liability for the punitive damages nor any interest that might be calculated attributable to the punitive damages judgment. If it is your feeling that you would desire counsel of your own choosing to participate in the appeal because of this position taken by American Mutual, you certainly have every right to designate counsel on your behalf in this connection.

Koehring, in a letter from Mr. Walton dated February 24, 1975, replied to Shell's letter by stating:

"In a letter from American Mutual dated November 3, 1969, that company specifically accepted complete coverage of both lawsuits (with a later exception for policy limits). Those lawsuits specifically demanded punitive damages in the complaints, and American Mutual was well aware of such demands. That letter is binding on American Mutual, and Koehring intends to enforce its rights thereunder. Moreover, I believe it approaches bad faith to take a position of non-coverage at this late date when, as you indicate, the law is unclear and you refused to enter into any meaningful settlement negotiations prior to judgment.

"Please consider this letter a formal demand to provide coverage of the complete judgment, if any, in both suits.

"If American Mutual continues to refuse coverage, it will be necessary for Koehring to retain separate counsel in this litigation and ultimately, perhaps, to pay a portion of the judgment. Koehring will take legal action if necessary to obtain reimbursement from American Mutual for any such expenditures."

The appeal was, to put it mildly, unsuccessful. The Court of Appeals for the Fifth Circuit, among other things, increased

Hyde's compensatory damages by $80,-668.59, to $242,005.79. The court also reversed the finding of no liability in Dunn's case, and returned it to the trial court for a calculation of damages. 546 F.2d 1193 (5th Cir.1977).

When advising Koehring of the unfavorable appellate decision, American's trial counsel, E.P. Lobrano, Jr. (Mr. Shell had died in the meantime), again advised Koehring that American would not cover the award of punitive damages to Hyde, and would not cover an award of punitive damages to Dunn if such were to be awarded because

> "... American ... still adheres to its position that its policy does not cover the finding for punitive damages when punitive damages are not permitted by law for recovery in an insurance contract in the jurisdiction in question."

Thereafter, on remand, the District Court awarded Dunn $99,929.51 in compensatory damages, and $25,000.00 in punitive damages.

On May 24, 1977, Mr. Lobrano advised Mr. McSweeney that American would not pay either the compensatory or the punitive damage awards in either case. American, however, proceeded to pay the judgments to Dunn and Hyde, with Koehring's agreement that this act of payment would not constitute a waiver of whatever rights American had to reimbursement.

In the present suit, filed in 1978, Koehring seeks a determination, by way of a declaratory judgment, that it is fully insured under the previously quoted provisions of the insurance policy in question against all sums arising from claims of malicious prosecution and abuse of process successfully litigated against it by Hyde, and from the claim of abuse of process on which Dunn prevailed. The judgments in favor of Hyde and Dunn are for a total of $251,-935.30 in compensatory damages, and $225,-000.00 in punitive damages. The matter is before me on Koehring's motion for summary judgment.

> We shall not flag or fail. We shall fight in France, we shall fight on the seas and oceans, we shall fight with growing confidence and growing strength in the air, we shall defend our island, whatever the cost may be, we shall fight on the beaches, we shall fight on the landing grounds, we shall fight in the fields and in the streets, we shall fight in the hills; we shall never surrender.

These words of Winston Churchill seem to aptly characterize the determination to fight on—at all costs and on many fronts— the battles growing out of the dispute here that started over twenty years ago. While the factual background I have related is drawn out and complicated, the balance of this decision will not be. I view the issue present here as a simple one. The material facts are not in dispute and, for the reasons that follow, Koehring's motion for summary judgment will be GRANTED.

■ As one of its several defenses, American contends that "abuse of process" is not a covered "hazard" under the policy. Nonsense. As the Wisconsin Supreme Court has stated,

> "Contracts of insurance should not be construed through the magnifying eye of a technical lawyer, but rather from the standpoint of what an ordinary man would believe the contract to mean." *Handal v. American Farmers Mut. Cas. Co.,* 79 Wis.2d 67, 255 N.W.2d 903 (1977).

The distinction between malicious prosecution and abuse of process is at best unclear. The theoretical legal distinction between "malicious prosecution" and "abuse of process" is not so clear that insurance coverage of one should exclude coverage of the other unless the exclusion is specifically stated in the policy. It is not excluded here. The term "malicious prosecution" in the policy must be interpreted to include "abuse of process". Mr. Pollard, American's spokesman, defined "malicious prosecution" as used in the policy to include coverage for "the use of legal prosecution for purposes other than what the process is supposed to accomplish". (Pollard Dep., Tr. 4). This definition is remarkably similar to the definition of abuse of process as describ-

ed by both the trial and appellate courts in the *Hyde/Dunn* litigation:

"Abuse of process is defined in Mississippi jurisprudence as 'the intentional use of legal process for an improper purpose incompatible with the lawful function of the process by one with an ulterior motive in doing so, and with resulting damages.'" *Dunn v. Koehring,* 546· F.2d 1193, 1199 fn. 19 (5th Cir.1977).

Here the "ordinary man" ("person", actually) alluded to in *Handal* would reasonably believe that "abuse of process" is a covered risk under the policy. I agree that it is.

■ Next, American contends that punitive damages are not covered under the policy. It strenuously argues that a finding of insurance coverage for punitive damages would contravene express and implied Wisconsin public policy. Nonsense again.

First of all, the policy in question, by its express terms, insures Koehring against "all sums which [it] shall become legally obligated to pay as damages...." Identical language in *Cieslewicz v. Mutual Service Cas. Ins. Co.,* 84 Wis.2d 91, 267 N.W.2d 595 (1978), has been construed as including coverage for punitive damages. The "public policy" favoring enforcement of contracts, especially between sophisticated parties like Koehring and American, is at least as strong as the "public policy" relied on by American to avoid coverage.

In *Harris v. County of Racine,* 512 F.Supp. 1273 (E.D.Wis.1981), Chief Judge Reynolds held that there is a strong public policy requiring that an insurer not be able to purport to provide coverage for certain types of injuries and then escape liability when a claim is made for reimbursement. In addition, Judge Reynolds found that absent a legislative determination that certain contract provisions are not legal, a court should be reluctant to interfere with contracts clearly entered into by parties.

■ In this case, American not only provided an insurance policy which purports to cover punitive damages, but American admitted this coverage, and undertook to defend the suits wherein such damages were sought in the complaint, and did not thereafter raise any coverage question until more than five years had elapsed and an adverse judgment had been rendered. It has been stated that it is a strong policy of this state that an insurer should not be able to purport to provide coverage and then escape liability when a claim is made for reimbursement. *A fortiori,* an insurer should not be allowed to escape liability where it attempts to tie the hands of its insured, claiming to have the exclusive right to control an insured's defense under the pretense that the policy provides coverage of all claims, and then when the cause is determined against it, insist that upon closer reading or upon some public policy ground the insured ought to be liable for at least part of the damages awarded. I find that punitive damages are covered under the policy, and that the policy must be enforced in favor of Koehring.

Although my preceding findings make it unnecessary to go further, one aspect of the present dispute simply leaps up and demands attention. The issue is waiver and estoppel. Clearly, if there ever was a case where those doctrines should apply, this is it.

American tried the *Hyde* and *Dunn* cases without a reservation of rights, expressly so advised Koehring. It handled the cases with full knowledge that a demand for punitive as well as compensatory damages was made by the plaintiffs. American made a conscious decision that it would cover both the compensatory and punitive damage claims. It then proceeded to assume full trial responsibility, and expressly declined Koehring's request to have its counsel participate in the litigation.

A case in point is *Pouwels v. Cheese Makers Mutual Casualty Co.,* 255 Wis. 101, 37 N.W.2d 869 (1948). In *Pouwels,* the insurance company had assumed all trial responsibility, as American did, without a reservation of rights. The court held that the insurer had waived its right to assert a defense of noncoverage:

"There had been no denial of liability, no notice of reservation of rights, and no

attempt of any kind had been made by the company to reserve any of its rights under the policy.

"The insurance company by its conduct waived its right to assert the policy defense of noncoverage." [citations omitted]. 255 Wis. at 107, 37 N.W.2d 869.

■ Under some circumstances an insurance company may change its mind and issue a disclaimer after it initially acknowledges coverage. But it may not do so after it has exercised dominion over the case at an important point. The rule is well stated in *Employers' Liability Assurance Corp., Ltd. v. Vella,* 366 Mass. 651, 321 N.E.2d 910 (1975):

"... if the insurer knows of its right to disclaim and exercises dominion over the case at an important point without disclaiming liability or reserving rights, subsequent disclaimer is barred."

Certainly, in the present case American knew of its right to disclaim—it did so and then expressly withdrew the disclaimer. Also, American exercised dominion over the *entire case.*

■ Some cases talk in terms of estoppel instead of waiver or failure to disclaim, but all reach the same conclusion: an insurer cannot change its mind after having tried and lost a case which it tried under an assurance of coverage. There is considerable authority to the effect that a liability insurer, by assuming the defense of an action against an insured, is thereafter estopped to claim that the loss resulting to the insured from an adverse judgment is not within the coverage of the policy. See Appleman's *Insurance Law and Practice,* § 4692. This is based on the premise that assumption of the insured's defense or unreasonable delay in asserting a defense to coverage clearly prejudices the insured.

In most jurisdictions, an insurer's control of the defense of a suit is automatically presumed to be prejudicial to the insured. *Pendleton v. Pan American Fire & Casualty Co.,* 317 F.2d 96 (10th Cir.1963); *Fidelity & Casualty v. Riley,* 380 F.2d 153 (5th Cir.

1967); *Sneed v. Concord Insurance Co.,* 98 N.J.Super. 306, 237 A.2d 289 (1967).

■ Prejudice is presumed because the insurer has taken away from the insured innumerable rights associated with the control of the defense, including the choice of trial by judge or jury; the ability to negotiate a settlement; and the ability to decide when and if certain defenses or claims will be asserted.

In the present case, evidence of prejudice abounds. American waived Koehring's very valuable right to a trial by jury. American, without input from Koehring, either decided or forgot to initially raise what may have been a valid statute of limitations defense. On the eve of trial, when American decided for the first time to raise the defense, the effort was unsuccessful for the reasons best stated in the subsequent appeal:

"Koehring urges on appeal that the actions by Hyde and Dunn are barred by the Mississippi statute of limitations for intentional torts and that the district court erred by applying an incorrect Mississippi limitations standard. It is unnecessary to consider whether the Mississippi limitation period for intentional torts is applicable because this limitation was never properly before the district court. Statutes of limitations are affirmative defenses and must be pleaded. Fed.R. Civ.P. 8(c). Koehring did not include the defense of the Mississippi statute of limitations in any of its pleadings. Pleadings may be amended only by leave of the court, Fed.R.Civ.P. 15, and, while such leave is to be 'freely given when justice so requires', it is within the discretion of the trial court. E.g., *Zenith Radio Corp. v. Hazeltine Research, Inc.,* 401 U.S. 321, 91 S.Ct. 795, 28 L.Ed.2d 77 (1971); *Freeman v. Continental Gin Co.,* 381 F.2d 459 (C.A.5, 1967). Koehring moved to amend its pleadings to assert the bar of the Mississippi limitation on the morning of trial, *Hyde Construction Co.* and *Dunn v. Koehring Co.,* 387 F.Supp. 702 at 712 n. 17 (S.D.Miss.1974), some five years after the action had been filed and after more

than four years of extensive preparation. After a hearing, the district court, in the exercise of its discretion, denied the motion for leave to amend because of 'cogent equitable considerations'. There was no abuse of discretion. We affirm on this issue. *Dunn v. Koehring Co.,* 546 F.2d 1193 (5th Cir.1977)."

American also exercised settlement control over the cases. It assessed the case as one involving $150,000 in actual damages and an unknown amount in punitives (see letter of March 12, 1971, from Attorney Shell). American decided to seek a $100,000 settlement on the basis of Shell's assessment. American decided to reject a $400,000 offer to settle on the eve of trial. In the end, it was American who tried the case on its own, with its lawyers, after having earlier expressly assured Koehring that it assumed coverage.

Around the time when American advised Koehring that the reservation of rights notice was withdrawn, American's position was that it

"... [intends] to exercise all of [its] rights of defense, including the right to sue [Koehring's] attorneys for malpractice in the event that there be a judgment against Koehring." Memo from R.D. MacLean of American, dated October 23, 1969.

Whatever rights Koehring had against its attorneys in this respect, and whatever the merits of such rights might have been, it is clear that the statute of limitations as against the attorneys has long expired. These rights, whatever their value, plus the right to a jury trial and the right to assert the statute of limitations defense have been lost forever. The loss of these rights is directly attributable to American's 1969 assurance that it would be solely responsible for the trial and for the damages which might be found to be owing. A stronger case for prejudice, and thus invocation of the doctrine of waiver and estoppel, would be hard to find.

Accordingly, Koehring's motion for summary judgment declaring that it is fully covered for all damages assessed in the *Hyde/Dunn* litigation is granted.

SO ORDERED.