**SMITHY BRAEDON COMPANY,**
**Plaintiff-Appellant,**

v.

**Mohamed Anwar M. HADID; Hadid Investment Group, Inc.; Oasis Development Corporation; Executive Office Centre Limited Partnership; Walter M. Cheatle; Ronam Corporation; James F. Quirk; American Real Estate Corporation, Defendants-Appellees.**

**No. 87-1050.**

United States Court of Appeals,
Fourth Circuit.

Argued June 30, 1987.

Decided Aug. 12, 1987.

Richard John Morvillo (Andrew D. Koblenz, Richardson, Berlin & Morvillo, on brief), for plaintiff-appellant.

Mark Scott Lindon (Michael H. Selter, Finley, Kumble, Wagner, Heine, Underberg, Manley, Myerson & Casey, Washington, D.C., Price O. Gielen, Melnicove, Kaufman, Weiner, Smouse & Garbis, P.A., Baltimore, Md., on brief), for defendants-appellees.

Before PHILLIPS, ERVIN, and WILKINSON, Circuit Judges.

ERVIN, Circuit Judge:

This case presents the issue whether a contract for real estate brokerage commissions is unenforceable under statutes and regulations of the District of Columbia, Maryland, and Virginia, when, as executed, the contract provides for the splitting of commissions with an unlicensed broker who performed no services.[1] The district court held that the contract was illegal and directed a verdict against the plaintiff, Smithy Braedon Company ("Smithy Braedon"), a licensed broker, in its suit for recovery of payments owed it by the defendants for services which the parties agreed had been fully performed by Smithy Braedon. We reverse; the affirmative defense of illegality under these statutes does not preclude

recovery by a licensed broker on a contract when the unlicensed broker, with whom commissions were shared, performed no services.

## I.

Smithy Braedon is a corporation organized and existing under the laws of the state of Delaware, with its principal place of business in Washington, D.C. Smithy Braedon primarily engages in the real estate brokerage business and is licensed to conduct such business in the District of Columbia, Maryland, and Virginia. Defendant Hadid Investment Group, Inc. ("HIG") is a corporation organized and existing under the laws of the Commonwealth of Virginia with its principal place of business in Rosslyn, Virginia. Defendant Oasis Development Corporation ("Oasis") was a Virginia corporation and was merged into HIG in the fall of 1985. Defendant Executive Office Centre Limited Partnership ("EOC") is a limited partnership organized and existing under the laws of Maryland with its principal place of business in Annapolis, Maryland. Collectively these defendants will be referred to as "the Hadid companies."

Smithy Braedon entered into separate contracts with HIG, Oasis and EOC to procure lessees for rental space owned by those companies. The parties have stipulated that Smithy Braedon provided the leasing agency services called for under its contracts and was therefore entitled, if the contracts were valid, to receive commission payments, calculated on an amount per rentable square foot, from the Hadid companies. Before billing the companies, how-

---

1. All three jurisdictions require persons to obtain a proper real estate broker's license before performing real estate brokerage work, including the leasing of real estate. *See* D.C.Code § 45–1926 (1986); Md.Ann.Code art. 56, §§ 217, 212(a) (1983); Va.Code Ann. § 54–749 (Supp. 1987).

The District of Columbia prohibits the knowing payment of a commission to anyone "for the performance of any service or act within the District defined in this chapter as the act of a real estate broker ... to any person who was not duly licensed at the time the service or act was performed." D.C.Code § 45–1940(c) (1986).

Maryland likewise makes it unlawful to pay "any compensation ... to any person other than a licensed real estate broker ... for the rendering of any service, or doing of any of the acts by this subtitle forbidden to be rendered or performed by other than licensees." Md.Ann.Code art. 56, §§ 227(a)(1) (Supp.1986).

The Virginia Commission on Real Estate, which is charged with the duty of establishing and enforcing real estate laws in Virginia, forbids a person from paying a commission or valuable consideration to any unlicensed person "for acts or services performed" without a license. Va.Real Estate Comm.Reg. 3.5.2 (1984).

ever, Smithy Braedon's leasing representative, Gary Faigen, was contacted by James F. Quirk, who was director of marketing for HIG. Quirk directed Faigen to include a "cooperating broker's commission" in its bills to all the Hadid companies. This commission amounted to one to two dollars extra per square foot of leased space for each building. The Hadid companies were to pay the additional commissions to Smithy Braedon, and Smithy Braedon was then to pay the extra money to a company known as American Real Estate Corporation ("American Real Estate"). Faigen testified that Quirk told him: "We have formed a company called American Real Estate. In the event that there is not a cooperating broker on any particular lease transaction, you will bill us as if there was a cooperating broker, that broker being American Real Estate." App. 176.

Faigen's supervisor, Fernando Barrueta, obtained confirmation from Quirk that these were his payment instructions. Barrueta also met with the president of Smithy Braedon, James Eichberg, and a vice-president, William Comerford, to discuss the arrangement. Eichberg requested that the other two men determine whether American Real Estate had a broker's license, and there was discussion about whether Smithy Braedon was entering into a "gray area" legally. Barrueta testified that he decided that the question of American Real Estate's license did not matter, because he thought American Real Estate was an owner of the buildings, as a party affiliated with the Hadid companies.[2]

The evidence introduced on Quirk's authority to enter into this arrangement was that individuals at Smithy Braedon believed that Quirk was a partner of Mohamed Anwar M. Hadid and Walter M. Cheatle, the

principals in the Hadid companies, and that Quirk was the normal liaison on all the work done by Smithy Braedon for the Hadid companies. On the other hand, Quirk himself never signed leases or checks on the deals consummated between these companies.

Smithy Braedon did not discover that American Real Estate was unlicensed until after Smithy Braedon had requested payment per the new instructions, had received partial payment, and had paid part of each of its partial commissions from the Hadid companies to American Real Estate. A total of $299,000 was paid to American Real Estate.[3] When Smithy Braedon requested that the Hadid companies pay the balance of commissions due on their brokerage contracts, totaling approximately $528,000, the Hadid companies refused to pay, and demanded that Smithy Braedon return the $299,000 that had been paid to American Real Estate. Smithy Braedon sued to enforce the contracts. The Hadid companies defended on the ground that the contracts, construed as requiring the payment of cooperating broker's commissions to an unlicensed broker, were illegal. The Hadid companies counterclaimed for the money paid to American Real Estate.

The district court denied the Hadid companies' pre-trial motion for summary judgment based on the illegality argument, and again refused to accept the argument when presented as a motion for a directed verdict following the presentation of Smithy Braedon's case. After the Hadid companies put on no direct evidence themselves and renewed their motion for a directed verdict, however, the district court granted the motion in a ruling from the bench.

2. All three jurisdictions whose laws are involved in this case exempt payments to certain property owners acting on their own behalfs from the prohibition against commission payments to unlicensed brokers. *See* D.C.Code § 45–1931(2) (1986); Md.Ann.Code art. 56, § 212(f)(4) (1983); Va.Code § 54–734 (1982). However, a shareholder in a corporation that owns property is not itself an owner of the property. *See Grenco Real Estate Inv. Trust v. Nathaniel Greene Dev. Corp.*, 218 Va. 228, 237 S.E.2d 107, 109 (1977).

3. The monies paid to American Real Estate apparently ended up in a California bank account that was used to purchase a $675,000 condominium in Colorado. Some checks drawn on the account of American Real Estate were paid to Mr. Cheatle and Mr. Quirk, of the Hadid companies, according to the plaintiff.

## II.

The standard for granting a directed verdict requires a court to view the evidence in the light most favorable to the non-moving party and draw every legitimate inference in favor of that party; having treated the adjudicatory facts in this fashion, the court must determine whether a reasonable trier of fact could draw only one conclusion from the evidence. *See, e.g., Walker v. Pettit Construction Co.*, 605 F.2d 128, 130 (4th Cir.), *modified on other grounds sub nom. Frith v. Eastern Air Lines, Inc.*, 611 F.2d 950 (4th Cir.1979); *Mays v. Pioneer Lumber Corp.*, 502 F.2d 106, 107 (4th Cir. 1974) (judgment n.o.v.), *cert. denied*, 420 U.S. 927, 95 S.Ct. 1125, 43 L.Ed.2d 398 (1975). The showing required is especially high where the moving party carries the burden of proof, *see Allen v. Zurich Insurance Co.*, 667 F.2d 1162, 1164 (4th Cir.1982) ("standard so stringent that its exercise is but rarely appropriate"), as with this defense of an illegal contract. No deference is due the trial court's decision; our review is de novo. *See Gairola v. Commissioner of Virginia Department of General Services*, 753 F.2d 1281, 1285 (4th Cir.1985).

## III.

In general, courts will not enforce contracts made in derogation of statutes designed to protect the public. *See, e.g.,* 6A A. Corbin, *Corbin on Contracts* § 1512, at 711 (1962); III S. Williston, *Williston on Contracts* § 1630, at 2865–66 (1920).[4] The failure of a party to comply with a licensing requirement often gives rise to such an illegal contract. *See Restatement (Second) of Contracts* § 181 & comment a (1981). The statutes at issue in this case are clearly designed to protect the public, not merely to raise revenue. *See, e.g., Smirlock v. Potomac Development Corp.*, 235 Md. 195, 202–03, 200 A.2d 922, 926

(1964); *Massie v. Dudley*, 173 Va. 42, 55, 3 S.E.2d 176, 181 (1939).

Before holding contracts unenforceable on public policy grounds, such as illegality, however, it is necessary to determine just what acts are forbidden. *See* 6A A. Corbin § 1512, at 717. "[C]ourts are averse to holding contracts unenforceable on the ground of public policy unless their illegality is clear and certain." *Wallihan v. Hughes*, 196 Va. 117, 82 S.E.2d 553, 558 (1954). An English judge aptly described public policy as "a very unruly horse, and when once you get astride it you never know where it will carry you." *Naylor Benzon & Co. v. Krainische Industrie Gesellschaft*, [1918] 1 K.B. 331, 342 (quoting Burroughs, J., in *Richardson v. Mellish*, 2 Bing. 229, 252). The Hadid companies would have this court ride off into uncharted and dangerous territories, in which persons have no certainty that their apparently valid contracts will be enforced, despite one side's full performance.

Public policy is usually made in the face of competing considerations, and in the context of this case the primary such consideration is freedom of contract. As Mr. Justice Holmes put it, "I think that at least it is safe to say that the most enlightened judicial policy is to let people manage their own business in their own way, unless the ground for interference is very clear." *Dr. Miles Medical Co. v. John D. Park & Sons Co.*, 220 U.S. 373, 411, 31 S.Ct. 376, 386, 55 L.Ed. 502 (1911) (Holmes, J., dissenting). Although courts do have a role to play in preventing the making of certain types of contract, the more important role of courts, in aiding the evolution "from status to contract," 6A A. Corbin § 1376 (quoting Sir Henry Maine), lies in enforcing contractual obligations.

[T]he right of private contract is no small part of the liberty of the citizen, and ...

---

**4.** Both Professors Williston and Corbin go to some length to inter the proposition that illegal contracts are "void" *ab initio*. *See* 6A A. Corbin § 1373; III S. Williston § 1630. Williston quotes Lord Mansfield on the correct statement of the legal principle: *"Ex dolo malo non oritur actio.* No court will lend its aid to a man who founds his cause of action upon an immoral or

an illegal act. If from the plaintiff's own stating or otherwise the cause of action appears to arise *ex turpi causa* or the transgression of a positive law of this country, the court says he has no right to be assisted." III S. Williston § 1630, at 2866; *see also Gibbs & Sterrett Mfg. Co. v. Brucker*, 111 U.S. 597, 601, 4 S.Ct. 572, 574, 28 L.Ed. 534 (1884).

the usual and most important function of courts of justice is rather to maintain and enforce contracts than to enable parties thereto to escape from their obligations on the pretext of public policy unless it clearly appears that they contravene public right or the general welfare.

*Baltimore & Ohio Southwestern Railway Co. v. Voight,* 176 U.S. 498, 505, 20 S.Ct. 385, 387, 44 L.Ed. 560 (1900). Because the enforcement of contracts is so important a function of courts, statutes that arguably operate to make otherwise valid contracts illegal must be carefully scrutinized to determine whether the contract actually subverts the purpose of the statute. Courts often find, on close inspection, that the penalty of nonenforcement of contracts is far in excess of the benefit to the public of nonenforcement. *See, e.g., Schloss v. Davis,* 213 Md. 119, 131 A.2d 287, 291 (1957).

The statutes and regulations of the District of Columbia, Maryland, and Virginia that forbid the splitting of commissions with unlicensed real estate brokers are inapplicable to this case, by their very terms. Each jurisdiction prohibits the sharing of commissions with unlicensed brokers "for the *rendering of any service,* or *doing of any ... acts,"* Md.Ann.Code art. 56, § 227(a)(1) (Supp.1986) (emphasis added), or equivalent language. There is no disagreement on this record that American Real Estate rendered no service and performed no act restricted by statute to licensed real estate brokers. Smithy Braedon did refer to the payments it sent to American Real Estate as "cooperating broker's commissions," but the denominating of payments as commissions when all parties understood that no brokerage services were performed is not an act toward which these statutes are directed.

This fact distinguishes this case from *Thorpe v. Carte,* 252 Md. 523, 250 A.2d 618 (1969). In *Thorpe,* which the district court recognized as the leading Maryland case on the issue of recovery by a licensed broker for commissions due under a contract that split fees with an unlicensed broker, the Maryland Court of Appeals held that a licensed broker could not recover such commissions. The Maryland court noted that the statute is designed for protection of the public against incompetence and dishonesty. It is clear that the unlicensed broker in *Thorpe* did perform services leading to the sale of real estate, thus raising the threat to the public that the statute seeks to prevent. In fact, the unlicensed broker introduced the parties to each other in *Thorpe;* the participation by the unlicensed broker was integral to the contract between the seller and the licensed broker.

Likewise, in *Grenco Real Estate Investment Trust v. Nathaniel Greene Development Corp.,* 218 Va. 228, 237 S.E.2d 107 (1977), the Virginia Supreme Court ruled on a related question and said: "if, with knowledge that an agent is unlicensed, an owner contracts with the agent to sell the owner's real estate, *the services are performed as the contract requires,* and the owner pays the stipulated compensation, the owner cannot recover the amount so paid." *Id.,* 237 S.E.2d at 110 (emphasis added). This is not precisely the issue now before us, but it demonstrates that the Virginia statute is concerned with the actual performance of services by unlicensed brokers, not with the mere entering into contracts that appear to make payments for such services, which the parties know will never be rendered.

The Hadid companies respond to this compelling distinction by arguing that Smithy Braedon was then guilty of misrepresenting the nature of the payments to American Real Estate in its invoices, because it listed American Real Estate as a cooperating broker. However, this characterization of the payments to American Real Estate came about by dint of Quirk's instructions. If Quirk had authority, actual or apparent, to enter into this arrangement, and in reviewing this directed verdict we must assume that he had such authority, then the Hadid companies cannot be shielded from their contractual duty by Smithy Braedon's alleged misrepresentation. The Hadid companies induced the misrepresentation. There was thus no dan-

ger that they would be misled as to the nature of the payments.[5]

In this case, no money was paid to an unlicensed broker for the performance of any services required to be performed by a licensed broker. Accordingly, the contracts calling for the payment of commissions to Smithy Braedon were not illegal, and the district court should not have directed a verdict against Smithy Braedon. We therefore reverse and order a new trial.

REVERSED AND REMANDED.

---

**5.** Because we hold these contracts legal, and therefore enforceable, we do not reach further to consider whether Smithy Braedon could be charged with knowledge that American Real Estate was unlicensed, whether the contract should be enforced because the parties were not *in pari delicto*, or whether the quirky payment scheme constituted a valid modification of what was originally an irreproachable contract.