**ST. PAUL MERCURY INSURANCE COMPANY, Plaintiff–Appellee,**

v.

**DUKE UNIVERSITY; Leonard R. Prosnitz, Defendants–Appellants,**

**and**

**Raymond U, Defendant.**

No. 87–3768.

United States Court of Appeals, Fourth Circuit.

Argued May 4, 1988.

Decided June 22, 1988.

Rehearing and Rehearing En Banc Denied Sept. 6, 1988.

---

Robert A. Burgoyne (Fulbright & Jaworski, Laura B. Luger, Moore & Van Allen, on brief), for defendants-appellants.

Joseph W. Yates, III, Barbara B. Weyher (Yates, Fleishman, McLamb & Weyher, on brief), for plaintiff-appellee.

Before HALL and WILKINSON, Circuit Judges, and MERHIGE, Senior United States District Judge for the Eastern District of Virginia, sitting by designation.

WILKINSON, Circuit Judge:

This is a declaratory judgment action brought by St. Paul Mercury Insurance Co. to determine coverage under an insurance policy issued by St. Paul to Duke University. A former employee of Duke, Dr. Raymond U, won judgments in North Carolina state court against Duke for malicious prosecution and against another Duke employee, Dr. Leonard Prosnitz, for defamation. Each judgment entailed an award of both compensatory and punitive damages.

St. Paul brought this action to resolve disputes over coverage, and the district court held that the policy did not, by its terms, cover the damages awarded against Prosnitz. It also held that, although the policy terms provided coverage for the punitive damages awarded against Duke, that coverage was barred by the public policy of North Carolina. Because the policy specifically excluded from coverage the damages awarded against Prosnitz, we affirm the district court's holding in that respect. We

reverse the district court's decision with respect to the punitive damages awarded against Duke. In the absence of an explicit North Carolina public policy with respect to the award of such damages, the terms of the insurance contract are controlling.

## I.

In 1983, a device known as a Thermotron, which is used in cancer research, was installed at Duke. A dispute arose between Duke, Dr. U, Dr. Prosnitz, and other Duke employees over the ownership of and access to the machine. As a result, Duke brought suit against Dr. U. The parties to that suit entered a consent agreement, and Duke voluntarily dismissed its suit. U then brought suit in North Carolina state court against Duke for malicious prosecution and against Prosnitz for libel and slander. A jury awarded U $30,000 in compensatory damages and $1,000,000 in punitive damages against Duke and $50,000 in compensatory damages and $50,000 in punitive damages against Prosnitz.

Duke and Prosnitz filed claims under Duke's insurance policy with St. Paul. The policy, over 150 pages in length, was issued in 1982 and provided coverage for a variety of losses stemming from the tortious behavior of Duke and its employees. Duke paid a premium in excess of $270,000 for each of the three years of the policy. St. Paul, refusing to pay any damages awarded against Prosnitz, or the punitive damages awarded against Duke, brought this suit to determine the scope of the policy's coverage.

The district court held that a provision in the policy, which excluded coverage for claims by employees for personal injury caused by fellow employees, barred coverage for the judgment against Prosnitz. *St. Paul Mercury Insurance Co. v. Duke University*, 670 F.Supp. 630, 632–33 (M.D. N.C.1987). We agree. The district court also found that the policy, by its terms, covered the punitive damages awarded against Duke. *Id.* at 633–34. The parties do not dispute this holding. The district court went on to hold, however, that the public policy of North Carolina forbids insurance coverage of punitive damages arising from intentional (albeit non-criminal) conduct, and refused to enforce the policy as written. *Id.* at 637. We reverse this holding.

## II.

■ In general, courts may refuse to enforce a contract as written where enforcement would contravene public policy. However, our commercial system depends on the ability of parties to contract with certainty. Were courts free to refuse to enforce contracts as written on the basis of their own conceptions of the public good, the parties to contracts would be left to guess at the content of their bargains, and the stability of commercial relations would be jeopardized.

The power to refuse to enforce contracts on the ground of public policy is therefore limited to occasions where the contract would violate "some explicit public policy" that is "well defined and dominant, and [which] is to be ascertained 'by reference to the laws and legal precedents and not from general considerations of supposed public interests.'" *United Paperworkers International Union v. Misco, Inc.,* — U.S. ——, 108 S.Ct. 364, 373, 98 L.Ed.2d 286 (1987) (quoting *W.R. Grace & Co. v. Rubber Workers,* 461 U.S. 757, 766, 103 S.Ct. 2177, 2183, 76 L.Ed.2d 298 (1983); *see also Smithy Braedon Co. v. Hadid,* 825 F.2d 787, 790 (4th Cir.1987). "[T]he usual and most important function of courts of justice is rather to maintain and enforce contracts, than to enable parties thereto to escape from their obligations on the pretext of public policy, unless it clearly appears that they contravene public right or the general welfare." *Smithy Braedon,* 825 F.2d at 791 (quoting *Baltimore & Ohio Southwestern Railway Co. v. Voigt,* 176 U.S. 498, 505, 20 S.Ct. 385, 387, 44 L.Ed. 560 (1900)).

■ The district court recognized that "[i]n the first instance ... questions as to public policy are for *legislative* determination." 670 F.Supp. at 635 (quoting *Gardner v. North Carolina State Bar,* 316 N.C. 285, 293, 341 S.E.2d 517, 522 (1986)) (em-

phasis added by district court). It went on to note, however, that the North Carolina legislature had provided no guidance on the question of whether insurance coverage of punitive damages arising from intentional but non-criminal acts is permissible, and took the absence of such guidance as an invitation to undertake its own analysis of public policy.

The district court thus saw its role as akin to that of a federal court sitting in diversity which must apply state law in an area in which the state itself has not spoken. In such a situation, the prediction of state law by the district court might be justified. In this case, while the district court did not err in looking to state law, its duty was to enforce the contract as written *unless* enforcement was forbidden by an existent state policy. Having found no such policy, the district court was bound to enforce the bargain as made by the parties.

The express reservation by North Carolina courts of the issue presented here does not justify the district court's refusal to enforce the contract. In *Mazza v. Medical Mutual Insurance Co.*, 311 N.C. 621, 626, 319 S.E.2d 217, 220 (1984), the Supreme Court of North Carolina held that it does not contravene public policy to enforce an insurance contract providing coverage for punitive damages arising from wanton or grossly negligent conduct. The *Mazza* court held that in such a case the public interest would be best served by requiring the insurance company to fulfill its obligation. *Id.* 319 S.E.2d at 221. The *Mazza* court, however, explicitly reserved the question of whether public policy prohibits insurance coverage for punitive damages arising from intentional conduct. *Id.* 319 S.E.2d at 220.

The district court, without explanation, found that the reservation of the issue in *Mazza* supported its decision in this case. 670 F.Supp. at 635. St. Paul argues that the *Mazza* court's reservation of the issue indicates that that court would decide the question differently with respect to intentional acts, and that the district court was therefore correct in concluding that North Carolina public policy would forbid insur-

ance coverage of punitive damages arising from intentional conduct. The *Mazza* court's reservation of the issue, however, is precisely that: a declaration of what the court was *not* deciding. To read a state court's refusal to decide an issue as a *de facto* decision of that issue would divest the state courts of their authority to determine state law.

We also cannot accept the district court's reliance on the "persuasive weight of authority" from other jurisdictions in determining that North Carolina's public policy would prohibit insurance coverage of punitive damages arising from intentional acts. It cited decisions by numerous courts in holding that the punishment and deterrence rationales underlying the award of punitive damages are inconsistent with the loss-spreading function of insurance. 670 F.Supp. at 636 n. 16. Other jurisdictions, however, have allowed such coverage on the basis of the strong public policy favoring enforcement of contracts. *E.g., Koehring Co. v. American Mutual Liability Insurance Co.*, 564 F.Supp. 303, 312 (E.D. Wis.1983); *First National Bank v. Fidelity and Deposit Co.*, 283 Md. 228, 232–43, 389 A.2d 359, 361–67 (1978). As one commentator has argued, to refuse to enforce a contract covering punitive damages for intentional acts would allow insurers to avoid an obligation for which they bargained, and to be enriched unjustly:

> [I]n those various contracts where the company insures against liability for false arrest, false imprisonment, malicious prosecution, libel, slander, and invasion of privacy, [punitive] damages—under current judicial practices—almost necessarily will follow. It is not seemly for insurance companies to collect premiums for risks which they voluntarily undertake, and for which they actively advertise in competition with other companies, and then when a loss arises to say "It is against public policy for us to pay this award."

12 J. Appleman, *Insurance Law & Practice* § 7031 at 155 (1981).

The insurance contract between St. Paul and Duke represents a conscious cali-

bration of risks. Duke bargained with St. Paul, and paid premiums to St. Paul, on the basis of the allocation of risk in the policy as written. The district court's decision, however, negates their bargain and leaves the parties guessing as to how the courts will decide a question on which, as the authorities cited by the district court make clear, reasonable minds may differ. Such a result would unjustly enrich the insurer, which collected premiums on the basis of a promise to absorb a risk it now seeks to avoid. It would also destroy to a large extent the certainty on which our commercial system depends. It is for this reason that the courts must enforce contracts as written in the absence of a clear and dominant public policy forbidding enforcement. The district court here erred in undertaking its own analysis of public policy and in refusing to enforce the bargain of the parties.

### III.

The district court also held that the insurance policy between St. Paul and Duke provided no coverage for the damages awarded against Prosnitz. We affirm.

The policy as originally written provided coverage for Duke's employees while acting within the scope of their duties, but *excluded* coverage for "[c]laims for bodily injury or personal injury to a fellow employee occurring on the job." This language would exclude coverage for the claims against Prosnitz. Duke and Prosnitz argue, however, that this language was deleted from the policy by a subsequent endorsement which reads as follows:

*What this endorsement does*

This endorsement expands coverage … to cover bodily injury claims brought against employees by their fellow employees. It does this by deleting one exclusion in your agreement.

*Injury caused by fellow employees*

This exclusion is deleted from your agreement.

*Other terms*

All other terms of the above agreement remain the same.

They contend that the damages against Prosnitz are therefore covered by the policy.

The endorsement, however, is clearly limited to claims for bodily injury. It does not expand coverage under the policy to include fellow employee claims for personal injury. The damages awarded against Prosnitz stem from libel and slander, which the policy defines as personal injuries. They are therefore not included within the terms of the endorsement and are specifically excluded by the terms of the policy.

For the foregoing reasons, the judgment of the district court is

AFFIRMED IN PART AND REVERSED IN PART.

K.K. HALL, Circuit Judge, concurring in part and dissenting in part:

I concur in the majority's opinion insofar as it reverses the district court's holding that the public policy of North Carolina precludes insurance coverage of punitive damages. Unlike the majority, however, I believe that the insurance policy provided coverage for damages awarded against Dr. Prosnitz. In my view, the University can act only through its employees. When it purchased the insurance policy, it intended for its employees to be covered while acting in the scope of their duties. Dr. Prosnitz was clearly acting within the scope of his duties as Dr. U's supervisor in the underlying dispute. In addition, my reading of the insurance contract leads me to the conclusion that the Fellow Employees Protection Endorsement creates an ambiguity which should be resolved in favor of the insured. *State Capital Ins. Co. v. Nationwide Mutual Ins. Co.,* 318 N.C. 534, 350 S.E.2d 66 (1986).

Accordingly, I would find coverage for Dr. Prosnitz exists under the policy.