613 A.2d 964

**Tammy CITARAMANIS et vir.**

v.

**Eustace HALLOWELL et ux.**

**No. 120, Sept. Term, 1991.**

Court of Appeals of Maryland.

Oct. 14, 1992.

Mary Beth McNamara, Columbia, for petitioners/cross respondents.

Janet E. LaBella, Annapolis, as amicus curiae (Charles H. Dorsey, Jr., Stuart R. Cohen, Barbara A. Samuels, Baltimore, Mary Helen McNeal, Towson), for Legal Aid Bureau, Inc.

Daniel H. Scherr (Beth A. Jackson, Reese and Carney, all on brief), Columbia, for respondents/cross petitioners.

Alvin C. Monshower, Jr., Michael L. Jennings, Richard L. Miller, McGuire, Woods, Battle & Boothe, Baltimore, amicus curiae, for The Maryland Ass'n of Realtors, Inc.

Argued before MURPHY, C.J., and ELDRIDGE, RODOWSKY, McAULIFFE, CHASANOW, KARWACKI and ROBERT M. BELL, JJ.

KARWACKI, Judge.

This case presents two important questions for our consideration: (1) whether in a private action under the Maryland Consumer Protection Act, a tenant may obtain restitution of rent paid for premises that are not licensed as required by a local housing code upon proof of no more than lack of licensure; and (2) whether a tenant is entitled to restitution of voluntary rent payments made on an unenforceable lease.

## I.

Responding to an advertisement in the Columbia Flyer, a newspaper circulated in Howard County, Tammy and Michael CitaraManis (the CitaraManises or tenants) inspected a duplex house at 7217 Carved Stone in Columbia which Eustace and Portia Hallowell (the Hallowells or landlords) offered for rent. Thereafter, the CitaraManises and the Hallowells entered into a one-year lease agreement, which provided that the CitaraManises would pay $850.00 per month in rent for the period from November 1, 1987 until October 31, 1988, as well as a security deposit of one month's rent.

During that one year tenancy the condition of the house was acceptable to the CitaraManises, and the Hallowells made minor repairs as needed. When the one-year lease expired, the parties orally agreed to extend the lease on a month to month basis, at an increased monthly rent of $875.00. This increased amount was paid by the tenants to the landlords until the CitaraManises vacated the premises at the end of April 1989.

Several days after the tenants informed the landlords of their intention to vacate the property on April 30, 1989, the CitaraManises learned that the premises at 7217 Carved Stone were not licensed during their tenancy as rental property by Howard County. On April 30, 1989 the couple moved out of 7217 Carved Stone.

Approximately three months later, the CitaraManises filed suit for damages in the Circuit Court for Howard County against their former landlords, alleging that the Hallowells had engaged in unfair and deceptive trade practices prohibited by the Maryland Consumer Protection Act, Maryland Code (1975, 1983 Repl.Vol., 1988 Cum.Supp.) §§ 13–301 through 13–501 of the Commercial Law Article (the CPA). Asserting in their Complaint that the lack of licensure and the Hallowell's failure to inform them of the lack of licensure constituted such unfair and deceptive trade practices, the CitaraManises sought restitution of the eighteen months rent they had paid to the Hallowells.

The Hallowells admitted in their Answer that at no time during the CitaraManises' tenancy was their house at 7217 Carved Stone licensed as rental property, as required by Howard County Code (1977, 1985 Rev.)[1] § 13.102, and con-

---

1. The Howard County Code in relevant part provided:
"**Sec. 13.100. Housing code; incorporation by reference.**
"The Housing Code of Howard County adopted by the board of county commissioners on December 22, 1964, as amended, is incorporated herein by reference.
"**Sec. 13.101. Enforcement authority.**
"(a) The department of public works is hereby given the power and authority to enter into, inspect and examine all buildings,

ceded that they failed to inform the CitaraManises that the required rental license had not been obtained.

Agreeing that no material facts were in dispute, the parties filed cross motions for summary judgment. Following a hearing, the Circuit Court for Howard County granted the tenants' motion for summary judgment and denied the landlords' cross-motion. The trial court reasoned that this result was mandated by this Court's decision in *Golt v. Phillips*, 308 Md. 1, 517 A.2d 328 (1986). On February 2, 1990, judgment in the amount of $15,450.00, representing all of the rent that the CitaraManises had paid during their tenancy, was entered in favor of the CitaraManises. A timely appeal to the Court of Special Appeals was noted by the Hallowells. The intermediate appellate court reversed

improvements, real and leasehold property and vehicles of every description, after giving the owner thereof prior written notice of five (5) days, to ascertain their condition for health, cleanliness and safety....

"Sec. 13.102.  Licensing and fees.

"The director of public works is hereby authorized and empowered to fix a schedule of fees or charges to cover the cost of inspection and for the issuance of a rental housing license for leasing, renting or letting of any buildings or structures, or parts thereof, as dwelling units for human habitation in Howard county.... Fee schedules for such inspection and licensing services will be approved by the council by resolution at the recommendation of the director of public works. No building or structure, or part thereof, shall be leased, rented or let or subleased, subrented or sublet without first obtaining a rental housing license from the department of public works and paying the requisite fee or charge therefor....

"Sec. 13.103.  Penalties.

"Any person, firm, corporation, or officer of a corporation who violates any provision adopted or enacted pursuant to the authority of this subtitle shall be guilty of a misdemeanor and, upon conviction thereof, shall be fined not less than $100 nor more than $1000. No conviction hereunder shall in any manner relieve any person of any other penalties or the necessity of compliance with all other applicable rules, regulations and laws. Alternatively or in addition to and concurrent with all other remedies, provisions adopted or enacted pursuant to this subtitle may be enforced with civil penalties pursuant to title 24, 'Civil Penalties,' of the Howard County Code. A first violation shall be a class D offense. Subsequent violations shall be class B offenses...."

the judgment of the trial court and held that because the CitaraManises had not demonstrated that any condition of the premises during their tenancy constituted a "substantial housing code violation" within the meaning of the rent escrow statute, Md.Code (1974, 1988 Repl.Vol.) § 8–211 of the Real Property Article, or that the lack of licensure had caused a diminution in the rental value of the property, they had not incurred actual damages, a prerequisite to recovery in a private action under the Consumer Protection Act. *Hallowell v. CitaraManis,* 88 Md.App. 160, 594 A.2d 591 (1991).

We granted the CitaraManises' petition for certiorari to determine whether a tenant who brings a private action under the CPA may be awarded restitution of rent paid for an unlicensed dwelling upon proving lack of licensure alone. The Hallowells' conditional cross-petition for certiorari also was granted in part to review the question of the right to restitution of voluntary payments made under an illegal contract.

## II.

In *Golt v. Phillips, supra,* John Golt, an elderly, disabled retiree, responded to an advertisement placed by Phillips Brothers and Associates for a furnished, multi-family, rental apartment. When Mr. Golt inspected the premises, he found that it needed cleaning and repairs. Mr. Golt was assured that the repairs would be made; however, Phillips Brothers failed to make the promised repairs. Consequently, Golt filed a complaint with the Baltimore City Department of Housing and Community Development regarding the condition of the apartment. During an inspection undertaken pursuant to the complaint, the housing inspector discovered that the unit was not licensed as required by the Baltimore City Code for multi-family rental use and that there were numerous housing code violations. These included the lack of the most basic health and safety measures: no toilet in Mr. Golt's apartment, no fire doors, defective door locks, and no fire exits.

Violation notices were sent to Phillips Brothers by the Department of Housing ordering them to repair the violations and either to obtain the proper license or to discontinue renting the apartment. Rather than correct the violations and obtain the proper license, Phillips Brothers evicted Mr. Golt during the lease term. Mr. Golt was forced to find another apartment and incurred moving expenses. The rent for his new apartment was $99.00 more per month than his original rent of $135.00.

Under these facts, we held that Phillips Brothers had engaged in unfair and deceptive practices in the rental of consumer realty. *Id.* 308 Md. at 11, 517 A.2d at 333. Specifically, we held that Phillips Brothers advertisement and rental of an unlicensed apartment was a prohibited unfair and deceptive practice expressly prohibited by the CPA which in § 13–301 states in pertinent part:

"Unfair or deceptive trade practices include any:

(1) False, falsely disparaging, or misleading oral or written statement, visual description, or other representation of any kind which has the capacity, tendency, or effect of deceiving or misleading consumers;

(2) Representation that:

(i) Consumer ... realty ... have a sponsorship, approval, accessory, characteristic ... which they do not have....

(3) Failure to state a material fact if the failure deceives or tends to deceive...."

We then addressed the damages which Golt was entitled to recover. We observed:

"Section 13–408 of the CPA sets forth the private remedy created by the act: 'any person may bring an action to recover for injury or loss sustained by him as the result of a practice prohibited by this title.' This private remedy is purely compensatory; it contains no punitive component. Indeed, any punitive assessment under the CPA is accomplished by an imposition of a civil penalty recoverable by the State under § 13–410, as well

as by criminal penalties imposed under § 13–411. *Thus, in determining the damages due the consumer, we must look only to his actual loss or injury caused by the unfair or deceptive trade practices."*

*Id.* at 12, 517 A.2d at 333 (emphasis added). Accordingly, we held that Golt was entitled to compensatory damages consisting of restitution of the rent which he had paid for three months for the uninhabitable apartment and consequential damages, such as the cost of moving from the premises and the additional cost of substitute housing for the remainder of the term of the lease which he had entered with Phillips Brothers.

The facts in *Golt* stand in stark contrast with those of the case *sub judice.* The CitaraManises do not allege that the house they rented was unclean, unsafe, uninhabitable or unsuitable in any regard. To the contrary, during argument before the trial judge, the CitaraManises' counsel explicitly argued that the condition of the property was irrelevant because the basis of their cause of action is misrepresentation regarding the failure to license, not the condition of the property.[2] Indeed, the CitaraManises elected to extend their tenancy and remain on the premises for another six months after the termination of the original lease at a higher rent.[3]

In support of their argument that the condition of the leased premises is irrelevant to their claim for restitution of the rent paid, the CitaraManises rely on the following language in our opinioin in *Golt.*

---

**2.** In Plaintiff's Reply Memorandum in Support of Plaintiffs' Motion for Summary Judgment, the CitaraManises argued that "the condition of the property is irrelevant and not material to a cause of action under the Consumer Protection Act (CPA), unless the misrepresentation at issue was regarding the condition of the property or the Plaintiffs were seeking damages for deficiencies, which they are not."

**3.** The CitaraManises argue that had they known of the lack of license that they would not have entered into the lease, or paid their landlord any rent; however, the facts indicate that they were satisfied with the condition of the premises.

"It is evident that the [multiple family dwelling] license fee is charged to support the cost of inspections, and not to raise revenue. Therefore, Phillips Brothers may not retain any benefits from the unlicensed lease, and Golt may recover his full damages."

*Id.* at 13, 517 A.2d at 334. Because of the obvious actual loss and damage suffered by the tenant in *Golt* who paid rent for what proved to be an uninhabitable apartment, we realize now, for the reasons hereinafter set forth, that we spoke much too broadly in making the statement just quoted.

### III.

█ Finding that existing laws were "inadequate, poorly coordinated and not widely known or adequately enforced," § 13–102(a)(2), the General Assembly enacted the CPA as a comprehensive consumer protection act to provide protection against unfair or deceptive practices in consumer transactions. § 13–102(b). The intention of the Legislature was to set "minimum statewide standards for the protection of consumers." § 13–102(b)(1); *see* § 13–103(a). To realize this end, the General Assembly sought to implement strong protective and preventive measures to assist the public in obtaining relief from unlawful consumer practices and to maintain the health and welfare of the citizens of the State. § 13–102(b)(3). In 1976, the CPA was amended to include consumer real estate within its coverage. Ch. 907 of the Acts of 1976. The Division of Consumer Protection of the Office of the Attorney General (Division) is given broad powers to enforce the CPA, including the ability to seek injunctions, cease and desist orders, restitution, and civil penalties. §§ 13–401 through 13–406 and 13–410. Such actions may be initiated by a consumer complaint or a Division investigation. Violators of the CPA may also be criminally prosecuted. § 13–411.

In addition to these methods of public enforcement, the Legislature has provided for a private action for damages

by a consumer who has been subjected to a practice prohibited by the CPA. Section 13–408 provides:

"(a) *Actions authorized.*—In addition to any action by the Division or Attorney General authorized by this title and any other action otherwise authorized by law, any person may bring an action to recover for injury or loss sustained by him as the result of a practice prohibited by this title.

"(b) *Attorney's fees.*—Any person who brings an action to recover for injury or loss under this section and who is awarded damages may also seek, and the court may award, reasonable attorney's fees.

"(c) *Frivolous actions.*—If it appears to the satisfaction of the court, at any time, that an action is brought in bad faith or is of a frivolous nature, the court may order the offending party to pay to the other party reasonable attorney's fees."

A consumer who has been subjected to an unfair or deceptive trade practice may elect to utilize either the public or private enforcement proceedings available under the CPA or may utilize both public and private enforcement proceedings, either simultaneously or in the alternative. The CitaraManises chose not to file a complaint with the Division and avail themselves of any of the CPA's public enforcement remedies; instead, they brought a private action pursuant to § 13–408(a).

It is manifest from the language employed in § 13–408(a) that the General Assembly intended that a plaintiff pursuing a private action under the CPA prove actual "injury or loss sustained." *Golt*, 308 Md. at 12, 517 A.2d at 333. Alperin and Chase give some insight into the rationale for restricting those who can invoke the private remedy provision of a consumer protection statute:

"Many of the state consumer protection acts permit a consumer to bring a private action against a businessman who has acted unfairly or deceptively only if the consumer has been injured or damaged by the businessman's conduct. This restriction is said to prevent aggressive

consumers who were not personally harmed by the prohibited conduct, or even involved in a transaction with the offending businessman, from instituting suit 'as self-constituted private attorneys general' over relatively minor statutory violations. Another fear is that the powerful weapon given to consumers in the form of the private remedy 'was capable of being used improperly for harassment and improper coercive tactics.' "

1 H. Alperin & R. Chase, *Consumer Law: Sales Practices and Credit Regulation* § 136, at 193 (1986) (footnotes omitted).

Notwithstanding the availability of both public and private remedies to consumers, the Legislature has established a clear distinction between the elements necessary to maintain a public enforcement proceeding versus a private enforcement proceeding. In a public enforcement proceeding "[a]ny practice prohibited by this title is a violation ... whether or not any consumer in fact has been misled, deceived, or damaged as a result of that practice." § 13–302. In contrast, a private enforcement proceeding pursuant to § 13–408(a) expressly only permits a consumer "to recover for injury or loss sustained by him as the result of a practice prohibited by this title." § 13–408(a). Section 13–408(a), therefore, requires an aggrieved consumer to establish the nature of the actual injury or loss that he or she has allegedly sustained as a result of the prohibited practice. This statutory construction creates a bright line distinction between the public enforcement remedies available under the CPA, and the private remedy available under § 13–408(a). *Cf. Consumer Protection v. Consumer Pub.*, 304 Md. 731, 770–71, 501 A.2d 48, 68–69 (1985) (holding that a public enforcement remedy does not require proof of actual deception of or harm to a consumer).

Commentators have concluded that this statutory distinction between the CPA's public enforcement remedies and its private remedy indicates that proof of actual damage is required under § 13–408(a):

"Enjoining an activity that has not yet caused actual harm seems entirely consistent with an important purpose of the Act, to prevent unfair or deceptive practices. *See id.* § 13–102(b)(3). *It is clearly contrary, however, to the language of § 13–408 to permit a consumer a cause of action if no damages have been sustained,* and no legitimate legislative purpose would be served by such a reading. Section 13–302 should be interpreted to pertain to enforcement action by the Attorney General and the Division of Consumer Protection, and § 13–408 should be read to control the elements necessary to establish a private cause of action."

Comment, *Maryland's Consumer Protection Act: A Private Cause of Action for Unfair or Deceptive Trade Practices,* 38 Md.Law.Rev. 733, 739 n. 50 (1979) [hereinafter Comment, *Maryland's Consumer Protection Act* ] (emphasis added). Thus, the CPA's public enforcement mechanisms are set up to prevent potentially unfair or deceptive trade practices from occurring, even before any consumer is injured, whereas § 13–408(a) requires that actual "injury or loss" be sustained by a consumer before recovery of damages is permitted in a private cause of action. A construction of the CPA that would establish § 13–302 as a benchmark to determine whether a consumer has sustained "injury or loss," within the meaning of § 13–408(a), is both strained and illogical.

Furthermore, in the case *sub judice,* awarding full restitution of the rent paid by the tenants who offered no proof of actual injury or loss would be in the nature of a punitive remedy, merely serving to penalize the Hallowells for their failure to obtain a license for the property and to serve as a deterrent to similar conduct on the part of landlords generally. Section 13–408(a) was not intended to punish the landlord or set an example for similar wrongdoers. *Golt,* 308 Md. at 12, 517 A.2d at 333. Rather the damages due to the consumer under § 13–408(a) are for "injury and loss"— such as will compensate the injured party for the injury

sustained due to the defendant's acts and for indirect consequences of such acts.

Arguably no landlord will comply with local licensure requirements for consumer realty if the penalty for such an unfair or deceptive practice is not severe, but the appropriate means for addressing this potential problem is through the imposition of civil penalties under § 13-410, and criminal penalties under § 13-411 of the CPA, not by transforming § 13-408(a) into a punitive measure. Sections 13-410 and 13-411 are intended to punish those persons who violate the CPA. The civil penalties provided by § 13-410 are a fine of up to $1,000 for the first violation and a fine not to exceed $5,000 for subsequent violations. Where no other criminal penalty is specifically provided elsewhere, § 13-411 provides for criminal penalties of up to a $1,000 fine or imprisonment not exceeding one year or both, in addition to any civil penalties. Significantly, the landlords in the instant case were also subject to civil penalties and criminal prosecution under § 13.103 of the Howard County Code. *See supra* footnote 1.

The CitaraManises contend that to require a showing of actual loss or injury as a precondition to a right of action under § 13-408(a) limits the recovery of a consumer to that available under preexisting law. We disagree. Section 13-408(a) provides a remedy to the consumer for many forms of misrepresentation not covered by the traditional theories of tort liability for deceit, contract actions for breach of express and implied warranties and warranties provided for under the Real Property Article and the Commercial Law article. *See generally,* Comment, *Maryland's Consumer Protection Act, supra,* at 740-53. Additionally, the CPA permits the award of attorney's fees to any person who is awarded damages under § 13-408(a). *See* § 13-408(b).

The CitaraManises assert that cases construing consumer protection acts from other jurisdictions support their position that a showing of actual damages is not a prerequisite to recovery under § 13-408(a) of the CPA. We are not

persuaded. We have reviewed these cases and observe that the consumer protection statutes construed therein fall into three general categories: (1) statutes that require proof of actual damages and in the absence of such proof award nominal statutory damages; (2) statutes that explicitly require that an aggrieved consumer be granted a complete refund; and (3) statutes that explicitly require actual damages be proven.[4] We conclude that the language of § 13–408(a) bears the most similarity to those statutes in category (3).

## (1)

*Leardi v. Brown,* 394 Mass. 151, 474 N.E.2d 1094 (1985) is representative of the cases in jurisdictions that permit recovery for injury to the consumer resulting from a violation of a consumer protection act, but require proof of actual damages and in the absence of such proof award statutory damages. In *Leardi,* tenants brought a class action against their landlord for use of deceptive and illegal clauses in the landlord's standard lease. They alleged that they need not demonstrate harm under the Massachusetts Consumer Protection Act in order to be entitled to recover damages and the court agreed. The court first held that the landlord was guilty of a deceptive practice under the statute and then determined that an injured consumer was not required to demonstrate "any loss of money or property, real or personal" in order to have a cause of action under the statute, because an amendment to the statute provided that the recovery for a person who has been injured shall be in the amount of actual damages or $25.00,

---

4. An exception is Vermont's consumer protection act, Vt.Stat.Ann. tit. 9, §§ 2453, 2461 (1984), which permits an aggrieved consumer to recover damages, or the consideration or the value of the consideration given by the consumer, reasonable attorney's fees, and exemplary damages, but does not require proof of actual injury or damage. *See Peabody v. P.J.'s Auto Village, Inc.,* 153 Vt. 55, 58–59, 569 A.2d 460, 463 (1989).

whichever is greater.[5] The tenants in *Leardi* were unable to prove any harm and therefore the court awarded each tenant statutory damages in the amount of $25.00.

Consistent with the decision of the *Leardi* court, the jurisdictions that have permitted recovery for injuries to the consumer resulting from violation of a consumer protection statute, without a showing of actual damages, have been those with statutes providing for the recovery to be the greater of the amount of actual damages or statutory damages. *Beslity v. Manhattan Honda*, 120 Misc.2d 848, 854, 467 N.Y.S.2d 471, 475 (N.Y.Sup.Ct.1983); *Geismar v. Abraham & Straus*, 109 Misc.2d 495, 499, 439 N.Y.S.2d 1005, 1008 (Dist.Ct.1981); *See also Rein v. Koons Ford*, 318 Md. 130, 142–44, 567 A.2d 101, 106–07 (1989) (construing a Virginia consumer protection statute).

In contrast to the Massachusetts statute at issue in *Leardi*, § 13–408(a) of the CPA does not provide the alternative relief of statutory damages in the absence of a showing of actual damages. Rather § 13–408(a) expressly restricts the action to persons "to recover for injury or loss sustained by him." The Legislature could have drafted a statute which provided for minimum statutory damages in the event of proof of a violation of the CPA, absent proof of actual damages. It chose not to do so.

### (2)

The New Jersey legislature enacted the Consumer Fraud Act, N.J.Stat.Ann. §§ 56:8–1 through 56:8–48 (West 1989), intending that it be one of the strongest consumer protection laws in the United States. *See New Mea Const. Corp. v. Harper*, 203 N.J.Super. 486, 501–02, 497 A.2d 534, 543 (1985). The act provides that: "Any person violating the provisions of the within act shall be liable for a refund of all moneys acquired by means of any practice declared herein

---

5. The Massachusetts Consumer Protection Act, Mass.Gen.L. ch. 93A, § 9 (1985), was amended in 1979 by deleting the requirement that private plaintiffs show some "loss of money or property." *See Leardi*, 394 Mass. at 158 n. 9, 474 N.E.2d at 1100 n. 9.

to be unlawful." N.J.Stat.Ann. *See Huffmaster v. Robinson*, 221 N.J.Super. 315, 319, 534 A.2d 435, 437 (1986) (additionally, the assessment of treble damages and attorney's fees is mandatory when a violation of the act has been proved). We reject the CitaraManises' suggestion of a statutory interpretation of § 13–408(a) that is identical to this statute.

(3)

In the instant case the Court of Special Appeals based its interpretation of 13–408(a) as requiring proof of actual damages on *Conaway v. Prestia*, 191 Conn. 484, 464 A.2d 847 (1983), which is exemplary of consumer protection acts that require proof of actual damages. In that case, a group of tenants brought a class action, alleging that their landlord had violated the Connecticut Unfair Trade Practices Act, Conn.Gen.Stat. §§ 42–110a through 42–110q, by collecting rents without first obtaining certificates of occupancy. In addressing the problem presented by the damages issue, the court distinguished those tenants who had established housing code violations, apart from the licensing violation, from those who had not made such a showing. In holding that the tenants who had not demonstrated housing code violations were unable to prove actual damages, the court reasoned, "They must present sufficient evidence to enable the trier to ascertain with reasonable certainty the diminution of the rental value occasioned by the defendants' wrongful conduct." *Id.* at 495, 464 A.2d at 853 (footnote omitted). Connecticut's statute expressly requires a showing of "actual damages" as a prerequisite for recovery of monetary damages,[6] whereas the CPA requires a showing of actual "loss or injury" to entitle a person to recover under § 13–408(a). Nevertheless, we decided in *Golt, supra*, that "in determining the damages due the consumer,

---

6. "Any person who suffers any ascertainable loss of money or property ... as a result of ... a [prohibited] method, act or practice ... may bring an action ... to recover actual damages." Conn.Gen.Stat. § 42–110g(a).

we must look only to his actual loss or injury caused by the unfair or deceptive trade practices." 308 Md. at 12, 517 A.2d at 333. *See also A. Secondino and Son, Inc. v. LoRicco,* 215 Conn. 336, 576 A.2d 464, 468 (1990). We adhere to that conclusion. The tenants, of course, will have the opportunity at trial to offer evidence of any actual loss or injury caused them by the fact that the leased premises was unlicensed as required by law.

## IV.

■ Finally, we reject the notion advanced by the Citara-Manises that, on the undisputed material facts before the trial court on their motion for summary judgment, they were entitled to obtain restitution of the rent they paid during their occupancy of the demised premises because the rent was paid pursuant to an illegal and unenforceable lease. Unenforceability of a contract because of illegality is a function of the strength of the public policy involved together with the degree of the violation of that policy under the facts of the case. *Schloss v. Davis,* 213 Md. 119, 124–25, 131 A.2d 287, 290–91 (1957). The CitaraManises rely on a line of Maryland cases dealing with claims for compensation for services rendered by persons who were engaged in occupations for which a license was required, in order to protect the public, but who did not have the required license. *See, e.g., S.A.S. Personnel Consultants, Inc. v. Pat–Pan, Inc.,* 286 Md. 335, 341, 407 A.2d 1139, 1143 (1979); *Harry Berenter, Inc. v. Berman,* 258 Md. 290, 293, 265 A.2d 759, 761 (1970); *Thorpe v. Carte,* 252 Md. 523, 529, 250 A.2d 618, 621–22 (1969); *Smirlock v. Potomac,* 235 Md. 195, 203, 200 A.2d 922, 926–27 (1964); *Snodgrass v. Immler,* 232 Md. 416, 421–22, 194 A.2d 103, 105–06 (1963); *Goldsmith v. Mfgrs' Liability I. Co.,* 132 Md. 283, 286, 103 A. 627, 628 (1918). In cases of that type this Court has denied a recovery, either on an express contract theory or on the theory of *quantum meruit,* sought by one who rendered services for which payment has not yet been made. Here we need not decide whether lack of the re-

quired rental housing license, in and of itself and without regard to the condition of the premises, would be sufficient to bar a landlord's claim for unpaid rent or for use and occupation. It is conceivable that a case could arise in which the public policy is so strong and the degree of violation so great that one benefitted by services rendered by an unlicensed person would be permitted to recover monies paid for the services, but that is not the situation presented on this record.

### A.

In this case, even if the lease were unenforceable by the landlords, the tenants have received everything that they bargained for, and a necessary element justifying the remedy of restitution, *i.e.,* unjust enrichment, is lacking. *Restatement of Restitution* § 1 (1937) ("[a] person who has been unjustly enriched at the expense of another is required to make restitution to the other."); II G. Palmer, *The Law of Restitution,* § 8.3; D. Dobbs, *Law of Remedies,* § 4.1, at 223–27 (1973); Williston, *A Treatise on the Law of Contracts* § 1479, at 275–76 (3d ed. 1970); Annotation, *Recovery back of money paid to unlicensed person required by law to have occupational or business license or permit to make contract,* 74 A.L.R.3d 637, 642.

In *Comet Theatre Enterprises v. Cartwright,* 195 F.2d 80, 83 (9th Cir.1952), plaintiff sued defendant contractor for the return of money voluntarily paid to the defendant on the ground that defendant was not licensed under the applicable state business and professional code. The code required contractors to procure a license and provided that failure to obtain a license was a misdemeanor. Unlicensed contractors were barred from suing to recover compensation for services, and thus, the court noted that under the statute, the plaintiff would not have been required to pay defendant for the services defendant rendered. This was a clear case of a consummated illegal transaction, the court reasoned, where the plaintiff acted under mistake of law in paying defendant. In response to the plaintiff's argument

that the licensing statute was passed for its benefit and that restitution was necessary to protect its rights, the court held that there can be no recovery of sums paid to an unlicensed contractor for services rendered where the services rendered are not defective and the party for whom they are rendered has received value for which he or she paid.

In *Host v. Gauntlett*, 73 Misc.2d 96, 98–99, 341 N.Y.S.2d 201, 203 (1973), the court addressed "whether the defendant who contracted to provide labor, services and materials under a home improvement contract, is obliged to return all moneys received, on the *sole* ground that the defendant did not have a license to do home improvement work." (emphasis in original). In support of its position, the plaintiff argued that since the defendant was not licensed to do the work set forth in the contract, that the contract was illegal, and urged that the defendant not be permitted to retain the fruits of his illicit activity. Further, the plaintiff argued that the defendant had earned no right by way of *quantum meruit* since his wrongdoing was an assault upon the public interest. The court determined that because the contract was illegal, the law must leave the parties where it found them. Quoting Judge Cardozo, writing for the New York Court of Appeals, the court stated:

> "The law may at times refuse to aid a wrongdoer in getting that which good conscience permits him to receive; it will not for that reason aid another in taking away from him that which good conscience entitles him to retain."

*Host*, 73 Misc.2d at 99, 341 N.Y.S.2d at 204 (quoting *Schank v. Schuchman*, 212 N.Y. 352, 359, 106 N.E. 127, 129 (1914)). Thus, the court determined that a defendant, who in good conscience provides services should not be required to return the moneys received, since in so doing, it would bestow an unjust enrichment upon the complaining party. Public policy is protected by enactment of the licensing statute and the criminal penalties found thereunder, noted the court, "[f]or to direct the defendant to return the moneys he

received would be tantamount to *civil* punishment in addition to criminal penalties, and as such, inconsistent with the traditional spirit of fair play in which every person has a vested interest, be he plaintiff or defendant." 73 Misc.2d at 100, 341 N.Y.S.2d at 204. Finally, the court concluded by noting that the plaintiff proceeded on the singular basis that the unlicensed status of the defendant is, in and of itself, sufficient to warrant a full return of all sums paid, regardless of the actual benefits received from the defendant's labors. The *Host* court rejected this argument, noting that all the plaintiff need do is to provide a sufficient basis for damages by showing that the work actually performed by the defendant was defective in some way.

In *Mosley v. Johnson*, 22 Utah 2d 348, 352–53, 453 P.2d 149, 152 (1969), a well driller sought to recover the balance due on a contract to drill a well. Defendants resisted payment on the ground that the well driller was not licensed and counterclaimed to recover a core drill which had been delivered as part payment. The court determined that the statute requiring well drillers to secure and keep annual permits is designed for protection of public and that one who drills a well without first securing such a permit cannot recover for work done, either on a contract or on a theory of *quantum meruit.* The court, however, noted that this penalty is severe enough, and the defendants for whom work was performed could not add to that penalty by recovering that which was voluntarily paid. *See also Food Management, Inc. v. Blue Ribbon Beef Pack, Inc.*, 413 F.2d 716, 727 (8th Cir.1969 applying Iowa law); *Goldman v. Garofalo*, 71 App.Div.2d 650, 650, 418 N.Y.S.2d 803, 803–04 (1979), *aff'd*, 50 N.Y.2d 851, 430 N.Y.S.2d 53, 407 N.E.2d 1349 (1980); *Grenco Real Estate Inv. v. Nathaniel Greene*, 218 Va. 228, 232, 237 S.E.2d 107, 110 (1977); *Homeland Insurance Co. v. Crescent Realty Co.*, 277 Ala. 213, 216–17, 168 So.2d 243, 246–47 (1964); *Kempf v. Joint School Dist. No. 3, Town of Fredonia*, 6 Wis.2d 95, 99, 94 N.W.2d 172, 174–75 (1959); *Allen v. Miller*, 1 Misc.2d 102, 103, 150 N.Y.S.2d 285, 286 (1955); *Vogel v. Lotz*, 26 N.J.Misc. 281, 60

A.2d 815, 816 (1948); *McShane v. Quillin,* 47 Idaho 542, 547–49, 277 P. 554, 559 (1929); *Hartnett v. Van Alstine,* 213 N.W. 595, 596 (Iowa 1927); *Gaither v. Lindsey,* 37 Tex.Civ.App. 149, 151, 83 S.W. 225, 226 (1904); *Johnston v. Dahlgren,* 166 N.Y. 354, 360, 59 N.E. 987, 988 (1901).

## B.

█ Further, the facts of the instant case on summary judgment do not present the degree of illegality that triggers application of the rule of the unlicensed occupation cases. The licensing requirement in the instant matter and that involved in *Golt v. Phillips, supra,* have as their purpose the identification of premises to be inspected in order to determine compliance with housing codes. Determining whether particular landlords or their agents have necessary qualifications to render services as landlords is not the object of either licensing scheme. In effect, premises and not people are to be licensed.

In this respect, the instant matter and *Golt* are more like *Schloss v. Davis, supra.* The plaintiff in *Schloss* performed what we would now call construction manager services in the construction of a residence for the owner. In the construction manager's suit on an oral contract for all of the allegedly promised compensation, the owner defended on the ground, *inter alia,* that the construction manager had violated the local building code by beginning work on the foundation and frame without a building permit. The permit apparently was obtained when final drawings became available before work progressed beyond the foundation and frame stages.

This Court rejected the owner's illegality defense. We said:

"There is no suggestion that any of the work did not meet all requirements, so far as public health or safety is concerned, or that the plans, when submitted, were not approved by the Buildings Engineer in all respects, before any of the interior work on the building was begun. The

contract for supervision was not illegal *per se.* At most, it was conditioned upon the obtaining of a permit by [the owner], based on the approval of the architectural drawings which [the owner] undertook to supply.

"It is the general rule that recovery will be denied if a contract is illegal in purpose or made by a person lacking the legal qualifications to contract. *F.S. Bowen Elec. Co. v. Foley,* [194 Va. 92] 72 S.E.2d 388 (Va. [1952]). Cf. *Goldsmith v. Mfgrs' Liability I. Co.,* 132 Md. 283 [103 A. 627 (1918)]. See also Note 118 *A.L.R.* 676. But there is a recognized exception in cases where a denial of recovery would impose a penalty out of all proportion to the public good, particularly where the violation is not of a serious nature and merely incidental to the performance of the contract. See *Williston, Contracts* (Rev. ed.), §§ 1631, 1765; *Restatement, Contracts,* § 600; *John E. Rosasco Creameries v. Cohen,* [276 N.Y. 274] 11 N.E.2d 908 (N.Y. [1937]); *Ogilvy v. Peck,* [200 Wash. 122] 93 P.2d 289 (Wash. [1939]); *Keith Furnace Co. v. Mac Vicar,* [225 Iowa 246] 280 N.W. 496 (Iowa [1938]); *Fox v. Rogers,* [171 Mass. 546] 50 N.E. 1041 (Mass. [1898]) (per Holmes, J.). This last case was explained, but not overruled on the facts, in *Tocci v. Lembo,* [325 Mass. 707] 92 N.E.2d 254 (Mass. [1950]). We think the violation here falls within the exception."

*Schloss,* 213 Md. at 125, 131 A.2d at 291; *see Smithy Braedon Co. v. Hadid,* 825 F.2d 787, 791 (4th Cir.1987); *Hiram Ricker & Sons v. Students Int'l Meditation Soc'y,* 501 F.2d 550, 557 (1st Cir.1974); *Gerry Potter's Store Fixtures v. Cohen,* 46 Md.App. 131, 136–37, 416 A.2d 283, 286 (1980) (citing and applying the above-quoted proposition in *Schloss* ).

The approval of dwellings under a rental housing licensing scheme, from a public safety and welfare standpoint, is more like the approval of plans for the construction of buildings than the licensing of service occupations. Inasmuch as the construction manager in *Schloss* was permitted affirmatively to recover promised compensation, *a fortiori,*

the Hallowells, on the present record, are not obliged to refund rent paid. On remand in this case, the task of the plaintiffs will be to show the degree of violation of the underlying housing code. The absence of a rental housing license in and of itself does not establish the right to recover rent paid.

For the same reasons set forth in this Part IV.B., we spoke too broadly in *Golt* to the extent that *Golt* rests the recovery of rent paid on the application to the licensing of rental housing of a per se rule derived from the occupational licensing cases. *Golt* did not discuss, or cite, *Schloss.* The result in *Golt* rests on the assumption that the premises were uninhabitable. Thus, the difference in rental value between the *Golt* premises as represented and their condition in fact was one hundred percent of the rent paid.

## V.

We agree with the Court of Special Appeals, although for somewhat different reasons, that the summary judgment in favor of the CitaraManises was improperly entered by the trial court. We shall order that the case be remanded to the trial court for further proceedings to determine whether the tenants are able to prove that they suffered "actual injury or loss," justifying recovery under § 13–408(a) of the CPA, or that the landlords' loss of all rent would be proportional to the purpose sought to be achieved by the licensing scheme.

JUDGEMENT OF THE COURT OF SPECIAL APPEALS AFFIRMED; CASE REMANDED TO THAT COURT WITH DIRECTIONS TO VACATE THE JUDGMENT OF THE CIRCUIT COURT FOR HOWARD COUNTY IN FAVOR OF THE PETITIONERS AND TO REMAND THE CASE TO THE CIRCUIT COURT FOR FURTHER PROCEEDINGS; COSTS IN THE COURT OF SPECIAL APPEALS AND IN THIS COURT TO BE PAID BY THE PETITIONERS.

Dissenting Opinion ROBERT M. BELL, J., in which ELDRIDGE, J. joins.

ROBERT M. BELL, Judge, dissenting.

In *Golt v. Phillips*, 308 Md. 1, 4, 517 A.2d 328, 329 (1986), this Court addressed the question "Whether the *leasing* of an unlicensed dwelling unit constitutes an unfair or deceptive act under Maryland's Consumer Protection Act (CPA)" (emphasis added). In an unanimous opinion, we answered in the affirmative. Noting that, "[i]n our view, advertising and renting unlicensed dwelling violates § 13–301(1), (2), and (3) [of the CPA]," [1] *id.* at 10, 517 A.2d at 332, we held, relying on authority from Connecticut, *see Conaway v. Prestia*, 191 Conn. 484, 464 A.2d 847 (1983), that "[i]t is fully apparent ... that Phillips Brothers's actions in renting the unlicensed dwelling constitutes an unfair and deceptive trade practice under the CPA." 308 Md. at 11, 517 A.2d at 333, citing *Conaway v. Prestia*, 191 Conn. 484, 464 A.2d 847 (1983). That case had recently held that the rental of apartments and the collecting of rents therefor without first obtaining proper licensing violated the Connecticut Unfair Trade Practice Act, which, like the Maryland CPA, prohibits "unfair or deceptive acts or practices in the conduct of any trade or commerce." 308 Md. at 11, 517 A.2d at 333.

Having determined that the rental of an unlicensed dwelling was an unfair and deceptive trade practice under the CPA, this Court proceeded to determine what damages

---

1. Maryland Code (1973, 1983 Repl.Vol.), § 13–301, in pertinent part, provides:

   Unfair or deceptive trade practices include any:

   (1) False, falsely disparaging, or misleading oral or written statement, visual description, or other representation of any kind which has the capacity, tendency, or effect of deceiving or misleading consumers;

   (2) Representation that:

   (i) Consumer ... realty, ... have a sponsorship, approval, accessory, characteristic ... which they do not have;

   \* \* \* \* \* \*

   (3) Failure to state a material fact if the failure deceives or tends to deceive ...

   These provisions are identical in the 1992 Replacement Volume. Section 13–201 has been amended since *Golt v. Phillips*, 308 Md. 1, 517 A.2d 328 (1986) was decided, although not the subsections under consideration in this case.

were recoverable under the CPA. We very clearly and, again, unanimously, expressed our agreement with the appellant's argument "that he should recover (1) restitutionary damages—the rent paid for August, September and October...." [2] 308 Md. at 11–12, 517 Md. at 333. Recognizing that § 13–408 of the CPA provided for a private, purely compensatory and non-punitive, remedy [3], we observed that "[I]n determining the damages due to the consumer, we must look only to his actual loss or injury caused by the unfair or deceptive trade practices." 308 Md. at 12, 517 A.2d at 333. We then addressed what constitutes "actual loss or injury." On that subject, we observed:

It is well settled in this State that if a statute requires a license for conducting a trade or business, and the statute is regulatory in the sense that it is for the protection of the public, an unlicensed person will not be able to enforce a contract within the provisions of that regulatory statute. Moreover, it is also well established that the unlicensed person will not be able to recover under quantum meruit, regardless of any unjust enrichment to the other party; to permit a recovery under quantum meruit would defeat the efficacy of the regulatory statute.

---

**2.** Golt also sought and was awarded "consequential damages—the cost of moving and the difference between the rental cost of the apartment and the higher rental cost of substitute housing maintained for three months." *Golt v. Phillips,* 308 Md. at 12, 517 A.2d at 333. This element of damages is not at issue in this case.

**3.** Section 13–408. Actions for damages.
    (a) *Actions authorized.*—In addition to any action by the Division or Attorney General authorized by this title and any other action otherwise authorized by law, any person may bring an action to recover for injury or lost sustained by him as the result of a practice prohibited by this title.
    (b) *Attorney's fees.*—Any person who brings an action to recover for injury or loss under this section and who is awarded damages may also seek, and the court may award, reasonable attorney's fees.
    (c) *Frivolous actions.*—If it appears to the satisfaction of the court, at any time, that an action is brought in bad faith or is of a frivolous nature, the court may order the offending party to pay to the other party reasonable attorney's fees.

308 Md. at 12, 517 A.2d at 333 (citations omitted). We concluded that "if the license [required] is designed to protect the public, appellees are prohibited from benefiting from the illegal lease of the apartment." 308 Md. at 13, 517 A.2d at 334.

Having determined that "the Baltimore City licensing requirement for multiple family dwellings is a model example of a public health and safety regulation," this Court asserted:

> It is evident that the license fee is charged to support the cost of inspections, and not to raise revenue. *Therefore, Phillips Brothers may not retain any benefits from the unlicensed lease, and Golt may recover his full damages.*

308 Md. at 13, 517 A.2d at 334 (emphasis supplied).

The majority characterizes the emphasized statement from *Golt* as the foundation for the petitioners', the CitaraManises', argument that their claim for restitution does not depend upon the leased premises being uninhabitable or, at least, defective in some way. Perceiving a real connection between "actual loss and damage" and the habitability of unlicensed premises, and, being aware from the statement of facts that, in *Golt*, the unlicensed premises were in a deplorable state, the majority overrules that statement, explaining that the Court spoke too broadly when it made it. op. at 149.

In so doing, the majority relies on an issue that was not present in *Golt*. Therefore, it could not have been and, in fact, was not critical to the Court's decision, a fact that even a cursory reading of the opinion makes obvious. In addition, disregarding principles of *stare decisis*, it moves precipitously, in this admittedly hard case, to provide extraordinary relief to parties who concededly acted illegally and against this State's public policy in an effort to "protect" them from the victims of the illegality and, in the process, makes bad law. Finally, the majority does by judicial fiat, that—undermine the effectiveness of local licensing laws—

which the Legislature refused to do when given the opportunity shortly after the *Golt* decision was filed.

Recognizing that *Golt* acknowledged that, unlike section 13–302, the public enforcement provision of the Act, section 13–408(a), requires proof of "actual injury or loss sustained," the majority expends considerable effort to establish that the actual injury or loss, to which reference is made, relates to the habitability of the premises, *i.e.* proof that the value of the premises was less than the rental paid rather than to the illegality of the lease. Among the arguments it advances are: to permit restitution to the tenant would be to punish the landlord, which is not permitted by § 13–408(a), *see Golt*, 308 Md. at 12, 517 A.2d at 333, and, to the extent that punitive measures are required to ensure that an unlicensed landlord complies with the licensure laws, the civil penalty provided for by § 13–410 and the criminal punishment prescribed by § 13–411 are sufficient. Moreover, the majority asserts that proof that an illegal contract is nonenforceable and, hence, that the offending party is not entitled to reap any benefits from it, is not enough. It suggests that *Golt* really does not address this issue or, due to its context, did not adequately do so.

The decision in *Golt*, either directly or by necessary implication, addressed the concerns the majority expresses: our discussion of § 13–408, *see* 308 Md. at 12, 517 A.2d at 333, clearly demonstrates that we were aware when we decided *Golt* that punishment was not its goal. Moreover, that we ordered restitutionary damages to be awarded, coupled with our recognition that only actual injury or loss could support a recovery, is a clear indication that we held that Golt actually suffered injury or loss. The Court not only unanimously addressed the actual damages question in *Golt*, but we defined it in terms of the rent paid for an unlicensed apartment: contrary to the majority's statement on page 149, we held that the restitutionary damages due to the plaintiff were for three months rent the plaintiff paid for the "unlicensed premises." *See* 308 Md. at 13–14, 517 A.2d at 334. Indeed, not even the closest reading will

disclose anything in *Golt* that suggests that the condition of the premises was important to the decision; there was never any mention in the opinion of the apartment's uninhabitability.[4]

The facts, including those pertaining to the condition of the leased premises, though detailed in the *Golt* opinion, played no role in our decision. Because our decision turned exclusively on the issue of whether advertising and renting an unlicensed apartment was a violation of the CPA, 308 Md. at 7 n. 2, 517 A.2d at 331 n. 2, only those facts surrounding the execution of the lease, especially those which were relevant to prove that they were unlicensed, were critical. The same is true of our decision as to the damages that could be recovered. Significantly, therefore, having set out the statement of facts, at no time, did we discuss, or even address, whether sufficient proof was offered, or was in the record, to support a finding that the leased premises were uninhabitable. We did not because the habitability of the premises was not an issue in the case. The record in that case revealed that, at all times, Golt contended that the violation of the CPA was the failure to obtain a license before advertising and leasing the apartment. He never argued that the condition of the premises was relevant to that issue or to his damages. I repeat, our resolution of the issue indicates that we agreed on all counts.

Had the habitability of the premises been the focal point of our inquiry into the proper damages, we would not have focused on cases addressing the effect of a failure of one required to do so, to obtain a license when a statute requires a license for regulatory, as opposed to revenue

---

4. In the proceedings at the trial level, the District Court concluded that Phillips Brothers, the defendant, improperly withheld $135 for rent for November 1983 because the apartment could not be rented legally. The trial court did not base its decision on the condition of the premises. In fact, the trial court found the conditions of the apartment to be irrelevant because Golt had inspected the premises prior to moving in.

generating, purposes. But that is precisely what we did. Thus, having concluded that such statutes do not permit an unlicensed person to recover damages either pursuant to contract or under quantum meruit, "regardless of any unjust enrichment to the other party", we went one step further and held that the unlicensed person could not benefit from the illegal contract at all. 308 Md. at 12, 517 A.2d at 333–34.

The analysis of the Baltimore City licensing requirement for multiple family dwellings conducted by the *Golt* Court was undertaken solely for the purpose of determining whether it was regulatory or revenue-generating. And it was in that same vein, rather than as a statement of the required condition of the premises that we commented that the licensing requirement was an aid to the City's efforts to maintain safe and healthful living conditions. Conspicuously absent from that discussion was an analysis of proof offered to establish the uninhabitability of the premises in that case. *Id.* at 13, 517 A.2d at 334. Again, no such proof was offered or relevant to our view of the case.

*Golt* held that, where a statute, regulatory in nature and designed to protect the public, requires a person to be licensed preliminary to conducting his or her trade or business, and that person fails to obtain a license before undertaking it and/or entering into a business relationship with another, it is against the public policy of this State to permit that person to enforce any resulting contract. The cases upon which we relied proceed on the premise that, because they are illegal, "courts of equity will not lend their aid to enforce an illegal contract ...," *Harry Berenter, Inc. v. Berman*, 258 Md. 290, 296, 265 A.2d 759, 763 (1970), whether or not, and, indeed, notwithstanding, that the other party to the contract may be unjustly enriched, "[t]he court's refusal ... not [being] for the sake of the defendant, but because it will not aid such a plaintiff." *Thorpe v. Carte*, 252 Md. 523, 529, 250 A.2d 618, 622 (1969), quoting Restatement (Second) of *Contracts*, § 598, cmt a. Quantum meruit recovery was not permitted, the cases indicated, because

that "would defeat and nullify the statute." *Harry Berenter, Inc.,* 258 Md. at 296, 265 A.2d at 763, citing *Northern v. Elledge,* 72 Ariz. 166, 232 P.2d 111 (1951); *Lewis & Queen v. N.M. Ball & Sons,* 48 Cal.2d 141, 308 P.2d 713 (1957). In extending the remedies available in the case of an illegal contract to include recovery, on a restitution basis, of amounts paid pursuant to the illegal contract, *Golt* simply recognized that, to do otherwise—not requiring an illegally gained benefit to be disgorged—would result in the unlicensed person benefiting significantly from his or her illegal conduct and violation of public policy. We also acknowledged thereby our affirmative duty to avoid allowing such a result.

Other courts, on similar logic, have reached consistent results. *See Rubin v. Douglas,* 59 A.2d 690, 691 (D.C.App. 1948); *Cooper v. Paris,* 413 So.2d 772, 773–74 (Fla.App. 1982); *State v. Masters Distributors, Inc.,* 101 Idaho 447, 615 P.2d 116, 123–125 (1980) (restitution may be ordered as an adjunct to injunctive relief sought by the State); *Huffmaster v. Robinson,* 221 N.J.Super. 315, 534 A.2d 435, 439– 440 (1986); *State v. Ralph Williams' Northwest Chrysler Plymouth, Inc.,* 82 Wash.2d 265, 510 P.2d 233, 241 (1973) ("[t]he recovery of that which has been illegally acquired and which has given rise to the necessity for the injunctive relief not only restores the property to the party but insures future compliance where it is assured a wrongdoer is compelled to restore illegal gains.").

In *Rubin v. Douglas,* a plaintiff sued to recover monies she paid the unlicensed defendant for treatment for her arthritis. The Healing Arts Practice Act required a person practicing the healing arts to be licensed. The defendant argued that, because the contract was illegal, the services were illegally rendered; hence, the plaintiff could not recover the monies she paid. The Municipal Court of Appeals for the District of Columbia rejected that argument. While acknowledging the general rule, it pointed out:

> However, if the parties are not in pari delicto, and one of them has not been guilty of serious moral turpitude, he

may repudiate the contract and recover what he has paid under it. And even though a party be considered technically in pari delicto he may be permitted to recover if the law in question was passed for his protection and it appears that the purposes of the law will be better effectuated by granting relief than by denying it.

In the present case we do not consider plaintiff in pari delicto with defendant, but even if she were it is apparent that the law was passed for the protection of the public, including plaintiff, and that the purposes of the Act will not be effectuated by permitting defendant to retain that which he ought not to have received. The public interests, in our opinion, are best served by requiring defendant to pay back the fruits of his illegal agreement.

59 A.2d at 691 (citations and footnote omitted).

*Cooper v. Paris* involved the payment of a portion of a real estate commission to an unlicensed real estate broker by a person who, when the payment was made, was aware that he was unlicensed. Having held the contract to be void and illegal *ab initio*, 413 So.2d at 773, the court ordered restitution of the part payment to be paid to the plaintiff. Rejecting the argument that by being aware that the defendant was not licensed to transact real estate business in Florida, the plaintiff was *in pari delicto* with the defendant, the court said:

When the legislature enacts a statute forbidding certain conduct for the purpose of protecting one class of persons from the activities of another, a member of the protected class may maintain an action notwithstanding the fact that he has shared in the illegal transaction. The protective purpose of the legislation is realized by allowing the plaintiff to maintain his actions against the defendant within the class primarily to be deterred. In this situation it is said that the plaintiff is not *in pari delicto*. This rule is applied in favor of a person seeking to recover back money for services performed by a person lacking a required license to perform such services.

413 So.2d at 773, quoting Maurice T. Brunner, Annotation, *Recovery Back of Money Paid to Unlicensed Person Required By Law to Have Occupational or Business License or Permit To Make Contract*, 74 A.L.R.3d, 637, 662 (1976). It went on to say that

> [T]o refuse to return the monies paid would affront this Court's affirmative duty to see that the party violating public policy not benefit in any way as a result of his wrongdoing. Otherwise, [the defendant] stands to be rewarded for his illegal activities, a result to which this Court cannot subscribe. Moreover, by allowing [the defendant] to keep these monies this Court would implicitly encourage unlicensed persons to seek up-front money, thereby eviscerating the salutary purpose of [the real estate broker's licensing law] by permitting those persons to keep any funds garnered prior to a judicial declaration that the contract is void.

413 So.2d at 774.

*Huffmaster v. Robinson*, a consumer protection case, is instructive insofar as it included in the definition of damages recoverable, *i.e.* restitution, the sum of $2,000 that the plaintiff paid the defendant on account of a contract to repair the plaintiff's car. 534 A.2d at 440.

The majority does not dispute that the lease in this case was illegal, against the public policy of the State of Maryland, and, hence, unenforceable. Indeed, it specifically so acknowledges. Nevertheless, relying primarily on out-of-state authority, much of which predates *Golt, e.g. Comet Theatre Enterprises, Inc. v. Cartwright*, 195 F.2d 80 (9th Cir.1952); *Host v. Gauntlett*, 73 Misc.2d 96, 341 N.Y.S.2d 201 (1973); and *Mosley v. Johnson*, 22 Utah 2d 348, 453 P.2d 149 (1969); *see also* 74 A.L.R.3d 637, 642, and decrying the unjust enrichment that would result were the petitioners awarded restitution, it holds that the public policy considerations are outweighed, in this case, by the degree of the violations. Therefore, the majority says that restitution is not a permitted remedy.

Inasmuch as *Golt,* like the cases the majority relies upon, was decided on restitution principles, I do not believe, as the majority implies, that we were not aware of those cases, including the ones discussed in 74 A.L.R.3d at 642. In point of fact, I am satisfied that being very much aware of them, we simply rejected their rationale. In any event, *Golt* was decided on Maryland public policy. The out-of-state decisions on which the majority relies, while similarly based on public policy, invoke the public policy of the state or jurisdiction whose law they applied. Juxtaposed against *Golt,* therefore, they simply are not persuasive.

The majority also relies upon a line of Maryland cases dealing with claims for compensation for services rendered, made by unlicensed persons engaged in occupations for which a license is required. I find that reference to be quite interesting, but also curious. Three of the four cases the majority cites to undermine the *Golt* principle predate that case. *Schloss v. Davis,* 213 Md. 119, 131 A.2d 287 (1957); *Gerry Potter's Store Fixtures v. Cohen,* 46 Md. App. 131, 136–37, 416 A.2d 283, 286 (1980); *Hiram Ricker & Sons v. Students Int'l Meditation Society,* 501 F.2d 550, 557 (1st Cir.1974). The one that was decided after *Golt* was decided by a court whose decisions are not binding on this Court. *Smithy Braedon Co. v. Hadid,* 825 F.2d 787, 791 (4th Cir.1987). As I indicated above, I am not convinced that we were ignorant of so well-known a principle when we decided *Golt;* on the contrary, I am satisfied that we considered, and rejected, its application to the facts with which we were there presented. Had these cases been cited in a concurring opinion to *Golt* the contention that we were mistaken when we decided *Golt* might now be persuasive. That having not occurred, however, that contention, made now, is, at best, unpersuasive and, in any event, too late.

In any event, an illegal contract will not be enforced even when the effect of non-enforcement will be to unjustly enrich the other party to the contract. Indeed, whenever a contract has been at least partially performed, one, or the other, of the parties to it will have been enriched, and when

enforcement is refused solely because the contract is illegal, unjustly so. This is particularly the case when quantum meruit recovery is disallowed as well. *Golt*, and the cases upon which it relied, recognized as much. Therefore, it is no answer to the petitioners' action that they will be unjustly enriched if permitted to recover restitution; to deny a party to a contract the right to recovery under that contract after it has been performed, or under quantum meruit, necessarily is to permit the enrichment, most often, unjustly, of the other party.

The cases that have addressed the issue have involved the situation in which the defendant has received a benefit, to which he or she would not otherwise been entitled, as the result of the partial or complete performance by the plaintiff of an illegal contract. When, therefore, the court refuses the request of the party who was author of the illegality of the contract, that party suffers a detriment. In this case, however, the petitioners have paid all of the sums due under the lease. Consequently, the issue is not now about enforcing an illegal contract for the benefit of the offending party; it is about, rather, whether an offending party will be allowed to enjoy, completely, the benefits of his or her illegal conduct. Here, the respondents have not suffered any loss as the result of their actions; on the contrary, they have benefitted to the fullest possible extent. The public policy of this State cannot condone such a result, even if it had contemplated it.

Rather than provide incentive to comply with the local regulatory scheme, today's decision provides a disincentive. If a landlord who fails both to obtain a license before renting his premises and to advise the tenants of that fact, is allowed to retain the fruits of that illegal conduct, that landlord may never feel the need to license the premises. He or she could lease the unlicensed premises until the tenant discovers the violation, secure in the knowledge that, as long as the tenant pays the rent when due, he or she has no, or at most, little, financial exposure for that violation. The tenant would never be able to recover the rent paid for

the premises; if, and when, the tenant discovers the lack of licensure, the tenant will not be able to take advantage of that fact, either because the tenant at that time would be *in pari delicto* or because it would be unfair to allow him or her to do so. Therefore, as soon as the tenant learns the premises are unlicensed, the landlord could effect his or her removal and, thus, be free to lease the premises to another, unsuspecting tenant. The scenario could be repeated over and over again, at great profit.[5]

The condition of the leased premises is one of only two conceivable distinguishing features between the case *sub judice* and *Golt.* Indeed, it is the only one the majority identifies. The majority's attempt to demonstrate that the reason for the principle enunciated in *Golt* no longer exists fails miserably. Therefore, since, as we have seen the habitability of the premises played no role in the *Golt* decision, that case is dispositive of the issue presented here.

There also is no basis for deviating from the *Golt* rule so soon after its enunciation. In *State v. Cohen,* 166 Md. 682, 688, 172 A. 274, 277 (1934), we asserted that doctrines established by decisions of this Court should not be aban-

---

5. Howard County Code § 13.103 makes violation of any provision of the Code a misdemeanor punishable by a fine of not more than $1000. Section 13–411 of the CPA, like § 13.103 prescribes a criminal punishment of not more than $1000 fine, 1 year imprisonment, or both. The CPA also provides a civil penalty; § 13–410 imposes a civil fine of not more than $1000 for each violation of the CPA, up to a maximum of $5000 for subsequent violations.

To be sure, were the Consumer Protection Division of the Attorney General's Office to pursue criminal charges against the lessor of unlicensed property, that might provide incentive for that lessor to obtain the proper license. Whether to pursue a particular violation, and then, whether to seek civil or criminal sanctions, rests in the sole discretion of the Consumer Protection Division. It also depends upon that Division's knowledge of the violation. It is significant that neither in this case nor in *Golt* was the Consumer Protection Division involved.

Civil proceedings under the CPA and the local criminal proceedings are not so satisfactory an incentive inducing agent as the CPA criminal proceedings. They provide only limited monetary exposure for the lessor, which may be dwarfed by the size of the profit derived from the unlicensed premises.

doned, unless the reason therefor has ceased. *See Rice v. Biltmore Apartments Co.,* 141 Md. 507, 513–14, 119 A. 364, 366 (1922) (a rule, once deliberately adopted and declared, ought not to be disturbed except for very urgent reasons and upon a clear manifestation of error). *Accord Hearst Corp. v. State Dep't of Assessment & Taxation,* 269 Md. 625, 643–44, 308 A.2d 679, 689 (1973) (doctrine of *stare decisis* is not to be construed as preventing a change in a rule of law *if* the rule has become unsound in the circumstances of modern life).

The only other conceivable basis for differentiating this case from *Golt* is the nature of the respondents, which, of course, colors the majority's perception of the equities. The respondents, unlike the appellees in *Golt,* are not in the business of renting real estate—the record reveals that the only house they leased was the single family dwelling, their former residence, which is the subject of this litigation. Were *Golt* to be affirmed, the respondents would have to return the respectable income they derived from that lease, $10,200 for the one year term and $5,250 for the month to month tenancy, to the petitioners, presumably at a great hardship. The equities not being as clearly on the side of the petitioners as they were in *Golt,* this case then is a "hard" case. But hard cases make bad law. *Federal Communication Comm'n v. WOKO, Inc.,* 329 U.S. 223, 229, 67 S.Ct. 213, 216, 91 L.Ed. 204, 209 (1946); *Northern Securities Co. v. U.S.,* 193 U.S. 197, 400–01, 24 S.Ct. 436, 468, 48 L.Ed. 679, 712 (1904) (Holmes, J. dissenting). The majority seeks to avoid what it considers to be a harsh result by changing the rules of the game. It can only be sympathy for the respondents which motivates and informs this decision.

Notwithstanding that it may be harsh in this case,[6] a result consistent with *Golt* would be neither unreasonable

---

6. To the extent that the result in this case is harsh when applied to a non-professional landlord, one who owns and rents only a single

nor unfair. It was, after all, the respondents who failed to obtain the necessary license and it was that failure that caused their present predicament. Their present misfortune is traceable to no one but themselves. I can see no reason to treat them any different than we would a professional landlord who made the same omission. Public policy does not favor relieving a party who admittedly failed to do what he or she was charged by law to do from the consequences of that failure. And the policy underlying the CPA does not justify such a result.

What *Golt* decided was clearly understood when the opinion was filed in 1986. Legislation which would have impacted the *Golt* decision was proposed during the 1989 session of the General Assembly. It, House Bill 391 ("HB 391"), would have amended § 8–204 of the Real Property Article to add the following:

(e)(1) Notwithstanding any local ordinance or regulation requiring the licensing or inspection of single or multi-family units, a tenant shall pay rent which is due to a landlord if:

(i) The premises were rendered to or provided for the tenants;

(ii) The premises were otherwise habitable;

(iii) The premises were used and enjoyed by the tenant; and

(iv) The tenant was under reasonable notice that the landlord, in rendering or providing such premises, expected to be paid by the tenant.

(2) The amount of rent paid by a tenant who rents a single or multi-family unit from a landlord who does not comply with a local ordinance or regulation described in paragraph (1) of this subsection shall reflect the difference between the property value of the rented unit and the property value of a similar unit rented in compliance

---

family home, the subdivision involved may amend its ordinance or statute to make an exception for such rentals.

with the local ordinance or regulation described in paragraph (1) of this subsection.

The obvious purpose of the amendment, as even a cursory review reveals, was to overrule *Golt*. Proponents of the bill admitted that this was so. The Legislation Committee of the Associated Landlords of Cumberland, Maryland, wrote to the House Judiciary Committee:

Dozens of landlords were sued by tenants for thousands of dollars because the landlords' permit was no longer valid. They were using a court case from Baltimore (*Golt vs. Phillips*) and the judges were helpless to rule in an equitable manner because the Maryland Law was mute on the subject. As a stop gap measure, Cumberland repealed [its] occupancy permit ordinance until a remedy could be found. We believe HB 391 is that remedy.

The letter written by the President of the Maryland Builders Association, in support of HB 391, opined:

This legislation is reasonable and necessary. There are circumstances when a person may be renting a unit where the landlord does not have all required licenses and inspections. So long as this unit is habitable and being used by the tenant, then the rent on that unit should be paid.

Its opponents joined the issue. The President of Baltimore Neighborhoods, Inc. opposed the bill because its passage

would allow landlords throughout the state of Maryland to be free from accountability in their duty to be properly licensed, which undermines the existing regulations of the local governments. This adversely affects tenants of multiple housing units in that the landlord suffers no consequences for failure to meet the standards mandated for such units.

The Legal Aid Bureau and the Legal Officer supervisor of the Baltimore City Department of Housing and Community Development, who characterized the intent of the bill as "to circumvent the ruling in a recent Maryland case (*Golt v.*

*Phillips*) where the Court of Appeals found a Baltimore City tenant entitled to recover rent paid for an unlicensed dwelling unit," both made the point that a licensing requirement, as part of the police power, is essential to a governmental subdivision's ability to ensure decent housing. The Housing and Community Development letter was specific:

There is an economic benefit to remaining unlicensed, and without the possibility of loss of rent there is little incentive to become licensed. A dwelling that is not licensed does not get inspected, unless there is a specific complaint. When an unlicensed multiple dwelling is discovered, the landlord is subject to a fine of $100 only if he fails to obtain the license within a reasonable time of being cited by a violation notice.

This bill establishes a disincentive for landlords to comply with the licensing law. Our code has a [definite] prohibition against renting an unlicensed unit. To allow a landlord to collect rent in such an unlicensed unit obviously undermines the effect of the law.

The proposed legislation did not make it out of Committee, the vote being 15 to 6, with 1 absent.

The facts that the decision in *Golt* was rendered in 1986 and, since then, the Legislature has taken no action to overturn or ameliorate its effect indicate that the Legislature has acquiesced not only in the interpretation we gave the CPA with respect to advertising and renting unlicensed premises, but also in the definition given to "injury or loss" as used in § 13–408 and in the remedy we prescribed for the CPA violation, as well. *See Nationwide Mutual Insurance v. USF & G*, 314 Md. 131, 143, 550 A.2d 69, 75 (1988) ("[T]he General Assembly is presumed to be aware of this Court's interpretation of its enactments and, if such interpretation is not legislatively overturned, to have acquiesced in that interpretation."); *Frank v. Storer*, 308 Md. 194, 203, 517 A.2d 1098, 1102–03 (1986). (Legislative acquiescence in interpretation placed on a statute should not be judicially altered.); *Frey v. Frey*, 298 Md. 552, 562, 471 A.2d 705, 710 (1984) ("[T]he General Assembly is presumed to be aware of

the prior holdings in this Court."); *Health Services Cost Review Comm'n v. Holy Cross Hospital,* 290 Md. 508, 519, 431 A.2d 641, 646 (1981) (The General Assembly is presumed to be fully familiar with the holdings of this Court); *Bingman v. State,* 285 Md. 59, 65, 400 A.2d 765, 768 (1979) (legislature presumed to know interpretation of statute by Court of Appeals prior to statutory amendment or revision).

In *Golt,* we held unanimously that the advertising and leasing of unlicensed premises violate § 13–301 of the CPA. We also held that where a license to rent premises was required for purposes of regulation, and not revenue generation, a lease of such unlicensed premises is void and against public policy and, therefore, not enforceable by the lessor. Moreover, we held that the lessee under such a lease may recover, as restitutionary, *i.e.,* actual, damages, the rent paid in respect of those unlicensed premises. 308 Md. at 11–12, 517 A.2d at 333. We did so because, we held, the lessor of unlicensed premises should not benefit in any way from his or her illegal acts. *Id.* at 12, 517 A.2d at 333–34. Without challenging the public policy underpinnings of *Golt* or the continuing vitality of the rule that illegal contracts are unenforceable, and with only an implicit disagreement with the notion that a party should not benefit from his or her illegal acts, the majority overrules the portion of the opinion which would permit a lessee to recover rent paid pursuant to an illegal lease. And it does so on a ground *Golt* rejected or, at least, did not rely on, maintaining, to the contrary, at least by implication, that *Golt* decided an issue that it plainly did not. And it does so despite the fact that the Legislature having been presented with the opportunity to reverse the *Golt* decision, refused to act, thus, acquiescing in its holding. This Court, in my opinion, has responded to an admittedly hard case by making bad law, in total disregard of the principles of *stare decisis* and, in the process, has taken a giant step toward undermining the licensing laws of the State's subdivisions.

I dissent.

ELDRIGE, J., joins in the views expressed herein.